JOSEPH GACCIONE, as Administrator, etc., of MICHAEL GACCIONE, Deceased, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 24538.)

Court of Claims, February 12, 1940.

*Budd, Coffey & Bertime* [*Bern Budd* of counsel], for the claimant.

*John J. Bennett, Jr., Attorney-General* [*Jacob S. Honingsbaum, Assistant Attorney-General,* of counsel], for the defendant.

GIBBS, J. The claimant's intestate, Michael Gaccione, had been a patient of the Hudson River State Hospital at Poughkeepsie, N. Y., for over twenty years, when on May 14, 1935, he was attacked by a four-year-old Holstein bull, and from the injuries so received he died about midnight of that day.

The State of New York owned, controlled and operated the said hospital, and in connection with it the State owned and utilized a herd of about seventy cows and the bull which killed Gaccione.

This claim is filed to recover damages for the death of Gaccione, alleged to have been caused by the negligence of the State, its officers and employees, in failing to provide him with adequate protection.

The cow barn had a wide corridor or feed alley running through the center of its entire length, so arranged that the cows were facing it on each side. At one end of the barn was the bull pen, nine by thirteen feet, with the walls extending to the ceiling, opening on the corridor by a door of iron lattice, fastened with lock and key. The key was kept where only attendants had access to it. When the bull was in that pen the door was always locked. There was also a door opening from the inside bull pen into an exclusive exercise yard for the bull, on the outside of the barn, which yard in turn had a door opening into a cross alley of the barn, fastened by a lever lock, easily opened by anybody, and not fastened by a lock and key, although it was manufactured to be used in conjunction with a padlock, if necessary, for safety, to prevent the lever from being operated. No padlock and key were used at this door; they should have been. Also across this doorway there was a slat door fastened by a hook. The exercise yard had a gate, securely bolted and locked with a chain, opening into a road. Thus, all exits from the bull's inclosure were securely locked except the door between the exercise yard and the barn, which door was fastened with only a lever lock.

At five o'clock on the day in question one attendant, Walter H. Cook, and seven patients in his charge, one of whom was Gaccione, were at the barn performing the usual work in the care of the cows — feeding, milking and other duties. The attendant, Cook, took charge of the milking; he was in a part of the barn some distance from the bull pen and exercise yard when the bull escaped through the door which had been fastened only with the lever lock; the bull attacked Gaccione, inflicting the injuries resulting in his death.

On May 15, 1935, the next day after the accident, Attendant Walter H. Cook testified upon the examination before the medical examiners of Dutchess county inquiring into the death of Gaccione, part of which is as follows:

"At about 5:45 p. m. I found patient, Gaccione, lying on the straw about two-thirds toward the south end of the barn in the central alleyway in a condition of collapse, left trouser leg off, stocking and shoe removed. I asked him what was wrong. He said: ' The bull hit me.' I said, Where? He said: ' In the back.'

I had been milking and my attention was attracted by patient, Patrick Donagher crying: ' the bull is loose.' I ran to the north end of the barn where the bull was throwing up hay in the box stall. I secured a staff and placed him in his usual stall and chained and locked the stall. At that time I noted the door further south from the bull pen, (also known as door No. 1, Ex. D) which leads into the corridor of the main barn, was open but the latticed gate was closed and hooked. I secured the assistance of Mr. Weldon, Charge Nurse of Cottage 9, which is across the road, and with him I carried the patient to the ward where he was immediately seen by Dr. Joseph Doltolo.

" This patient has worked in the cowbarn with me for a year and has often with other patients been warned against going near the bull or the bull pen. He has never before to my knowledge attempted to attend the bull in any way. I did not see the bull enter the barn nor did I see the patient struck by the bull."

An immediate examination of Gaccione by several hospital physicians disclosed that he was suffering from extreme shock, was " cold," " clammy " and " pulse feeble " and " had fractures in his chest," and other internal injuries. All known remedies were administered, but the injured patient gradually grew worse and died at midnight.

The bull, on the afternoon of the day in question, had been confined in the exercise yard outside of the barn and his only escape from that yard was through the doorway which was closed by a latticed door fastened by a hook and the sliding door fastened by a lever lock. The lock could be operated only by a human agency but could be operated easily by anybody. The door must have been opened by either the decedent, whose cap was found near the door, or by some other patient of the hospital. At the time there was no employee of the State in the barn except Attendant Cook, who was some distance away from that door. Whether Gaccione or some other patient opened the door which let the bull out is of little consequence, as the door should have been so securely fastened that no hospital patient could have opened it.

Gaccione had the mentality of a three- or four-year-old child, and he should have been protected from his own folly or the stupidity of one of his fellow inmates, whoever opened the door letting the bull into the barn. This was a forseeable result from leaving a door to the bull's yard unlocked.

The question that remains to establish the State's negligence is whether it was likewise forseeable that if the bull were loose in the barn he would injure someone. It has been held that the owner is not responsible for an injury to another, caused by kicking, biting

or other vicious propensity of his animal, unless the dangerous character of the animal was known to him. (*Benoit* v. *Troy & Lansingburgh R. R. Co.*, 154 N. Y. 223.) That knowledge may be brought home to him by proof of prior acts of a similar kind, or it may be imputed from the recognized dangerous characteristics of such an animal: " The owner of a domestic animal is bound to take notice of the general propensities and characteristics of the class to which it belongs, and must anticipate and guard against them if of a nature to cause injury, for he necessarily knows that some act causing injury will be committed if opportunity therefor is afforded." (*Bertram* v. *Burton*, 129 Kan. 31; 281 P. 892; *Hammond* v. *Melton*, 42 Ill. App. 186; *Gropp* v. *Great Atlantic & Pacific Tea Co.*, 141 App. Div. 372.) Judicial notice is taken of what animals are domestic, and of the habits, instincts and propensities of such domestic animals. (*Tolin* v. *Terrell*, 133 Ky. 210; 117 S. W. 290; *Hill* v. *Tualatin Academy*, 61 Ore. 190; 121 P. 901; *State* v. *Widman*, 112 Miss. 1; 72 So. 782.) The court will take judicial notice of the fact that a four-year-old bull has a dangerous and unpredictable character. The natural males of domestic animals, which are kept for breeding purposes, develop great strength after they become a year old and, more often than not, develop mischievous, harmful and vicious propensities requiring careful oversight and extreme care to keep them securely confined in inclosures from which they cannot escape.

It is apparent that the State employees knew that the probable result of this Holstein bull being loose in the cow barn, where the hospital patients were, would be that someone would be hurt. This is shown not only from the common knowledge of the nature of such a bull, but also from the various precautions they saw fit to employ, namely, the solitary confinement of the bull within partitions which ran to the ceiling, the heavy iron door on the box stall securely locked at all times by a padlock, the key to which was kept out of the reach of patients, the sturdy fence and lock on the exercise pen, the double doors between the barn proper and the exercise yard and the frequent warnings given to the patients to stay away from the bull pen.

There can be no question that the element of knowledge of the bull's dangerous propensities was present. As in the case of the watch dog in *Hahnke* v. *Friederich* (140 N. Y. 224), the manner in which he was restrained indicated a knowledge by the defendant of the viciousness of the animal.

It was negligent for the State to keep a four-year-old bull insecurely confined. One who keeps a dangerous animal with knowledge of its vicious propensities incurs a *prima facie* liability for any

injury caused by it, and the presumption can be rebutted only by proof that the injured party wantonly excited or unnecessarily put himself in the way of the animal. (*Hunter* v. *Metropolitan Express Co.*, 50 Misc. 158; *Glidden* v. *Moore*, 14 Neb. 84; 15 N. W. 326.) As the deceased was not capable of mature understanding he cannot be charged with contributory negligence. The mere warning given to patients with childish mentalities was insufficient precaution, and the State was negligent in failing to protect its charges from a known danger. It was the duty of the State to use reasonable care and diligence, not only in treating, but in safeguarding the deceased, measured by his capacity to provide for his own safety. (*Robertson* v. *Towns Hospital*, 178 App. Div. 285.) The State is answerable in damages for the death of Gaccione, which was the result of its employees' negligence.

The assessment of damages is governed by section 132 of the Decedent Estate Law. The amount of damages may be such a sum as the court deems to be a fair compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought. Reasonable funeral expenses of the decedent may be included. The precise question in this claim is what were the probable chances of pecuniary benefit, from the continuance in life of the decedent, worth under all the existing circumstances. (*Thomas* v. *Utica & Black River R. R. Co.*, 6 Civ. Proc. Rep. 353; *Arnold* v. *State*, 163 App. Div. 253; *Dimitroff* v. *State*, 171 Misc. 635.)

Gaccione was admitted to the Hudson River Hospital February 3, 1909, at the age of twenty-one. In June, 1909, he was discharged. He was readmitted to the same institution March 5, 1910, paroled July 12, 1910, and discharged the next month. After six months on his own responsibility he was committed to Central Islip State Hospital. A year later he was paroled from the Islip Hospital and discharged October 21, 1912. A fourth time he was committed to a State hospital. He was readmitted to the Hudson River State Hospital August 6, 1913, and was there continuously until his death, May 14, 1935. It appears from the history of the case that Michael Gaccione had failed to make good four times. The doctor called by the claimant testified: A patient who has suffered from dementia præcox for over twenty years would probably have a severe deterioration of his intellect and his emotions." This probable deterioration took place after the early period during which time he failed four times to acclimate himself to a normal life. Dr. Thompson, who treated the deceased from January, 1927, to August, 1934, said: " he was progressively becoming worse." The most the claimant's doctor could say was that the possibility of

Gaccione's becoming a self-sustaining member of society would be very slim. This doctor was speaking from the records; he had never known deceased as Dr. Thompson had. The crux of the matter is that the measure of damages must be confined to the reasonable expectation of a pecuniary loss. In this case there is no proof of a reasonable expectation that Gaccione would have been discharged again and that he would ever have been in a position to enhance the value of his estate for the benefit of his adult children.

The award must be confined to funeral expenses.

MURPHY, J., concurs.