Melvin H. Osterman, J.
This is a claim for the alleged negligence of the State of New York in the maintenance and operation of Rockland State Hospital, a State mental institution, located in Orangeburg, New York.
*758 On August 7, 1958, a patient at the hospital named Leon Thomas escaped and arrived at the nearby home of Mrs. Evelyn Finkel. Thomas gained access to the Finkel home and brutally inflicted fatal injury to Mrs. Finkel. He was thereafter apprehended by the police and is now incarcerated at Matteawan State Hospital for the criminal insane. This claim is brought against the defendant alleging that the State negligently permitted this escape to occur through its laxity in the supervision and control of Thomas.
Much law has been written with respect to tragic cases like the one at bar and much has been said with respect to the balance between protection of the community and modern management of a mental hospital. Yet the basic determination of liability lies with the simple elements of negligence, viz.: the duty to be observed and the breach of that duty.
The duty to be observed has been succinctly defined in Excelsior Ins. Co. of N. Y. v. State of New York (296 N. Y. 40), thusly: “ So far as third persons were concerned, though, the State stood in loco parentis. (Cf. Restatement, Torts, §§ 316-317.) The State owed the community, the outside world, no greater duty than would parents under similar circumstances. In the absence of reason indicating a need to isolate him neither parent nor State is under the necessity of locking him up or keeping him under constant surveillance.” In that case the court said that since the hospital had no notice of dangerous proclivities harbored by the patient, it was under no duty to keep him under constant surveillance. The reasoning of the Excelsior case has been followed with unanimity by our courts in cases of escaped patients committing criminal acts (Flaherty v. State of New York, 296 N. Y. 342; St. George v. State of New York, 283 App. Div. 245, affd. 308 N. Y. 681; Williams v. State of New York, 308 N. Y. 548).
The Excelsior decision, however, merely defines the duty to be obeyed by simply reiterating that it is measured by ‘ ‘ the risk reasonably to be perceived ”. In the case at bar, the patient Thomas had already been placed in a disturbed ward by the hospital; the need for constant guarding and surveillance had already been established by the doctors who placed him there. The ward in which Thomas was housed was classified for disturbed patients only; if the patients quieted down they were returned to other wards; these patients were allowed to mingle with other patients only in the dining room and at no other time; and, most important, these patients were required to be under constant supervision and surveillance during their everyday functions including washing, taking their ablutions, eating, *759 etc. Indicative of the degree of supervision which the hospital itself imposed over a patient like Thomas was the fact that “ in his particular case [the amount of freedom] would he that he would be permitted to go to the dining room in a group ”.
The duty has thus been defined by placing Thomas in that type of ward. The Excelsior case and cases which follow it are concerned primarily with and the gravamen of their decisions is the degree of supervision which the State was required to exercise over a particular patient recognizing that the State cannot constantly guard all patients. Here, however, this patient, by the hospital’s own standards, was one to be guarded constantly and we, therefore, need not determine as in Excelsior whether, on the basis of past history, the hospital should or should not have placed this man under constant surveillance. By the determination of the hospital in placing Thomas where it did, this case has been removed from the primary consideration of the Excelsior case and, indeed, from the cases finding liability which follow Weihs v. State of New York (267 App. Div. 233) and Benson v. State of New York (52 N. Y. 8. 2d 239).
The duty having been established as one requiring continuous and constant surveillance and guarding, it is left for us to determine whether that duty has been breached. On the day of the tragedy, Thomas was permitted to go to the dining room for lunch at approximately 12:30 to 12:45 p.m. Upon his group’s return at 1:00 p.m., his absence was noted and reported. Therefore, we can assume that the escape must have occurred sometime during this luncheon period and in the lunchroom area. It is undisputed testimony that the patients in Thomas’ ward leave to go to the dining room at the aforesaid hour; that they descend a set of staircases and proceed along a tunnel which empties directly into the dining room; and that after lunch, they return to the ward by the same means of travel. No guards accompany them along the way, but there is a guard checking the patients out of the ward into the lunchroom and one checking them upon their return. There are only two doors in the entire area which lead outside of the hospital or outside of the tunnel-dining room area. One door is supposed to be locked and guarded and the other door is supposed to be locked and unguarded but within the vision of one of the attendants. It is within this framework that Thomas was able to escape.
Negligence cannot be presumed yet this does not mean “ that there must be in every case eye-witnesses of the defendant’s conduct. Negligence, like any other fact, may be proved by circumstantial evidence ” (Prosser, Torts [2d ed.], p. 200). In the case at bar, no direct evidence of the escape was given and *760 it is obvious that such evidence would hardly be available. But evidence was given about the wards, the number of guards, the area of travel of the patients and the time lag of the escape. Such circumstantial evidence is presented to this court as a question of fact to be weighed and determined by the court. Thomas’ only available means of egress were the two doors. The defendant protests that the doors were locked and guarded or locked and within the vision of the attendant who testified that he did not see Thomas escape. As was said in the Weihs case (supra, p. 235) in replying to the State’s contention that all precautions were taken, “ That argument carries its own refutation in view of the fact that Browning did escape.”
Had all the doors been locked and guarded as they were supposed to be, Thomas could not have escaped. It is the only logical conclusion from the facts elicited that Thomas did escape through an unlocked door or through a door where there was insufficient or lax guarding. In view of the duty to be exercised with respect to a patient such as Thomas as indicated above, this conduct on the part of the defendant equates with and we find it to be negligence.
With respect to the damages to be awarded, we must, of course, separate the cause of action for conscious pain and suffering and the cause of action for wrongful death. The court finds that Mrs. Finkel suffered great conscious pain and suffering before her death which can be best described by the testimony of an eyewitness to the assault, who entered Mrs. Finkel’s house while Thomas was inflicting the fatal blows. The witness, Mrs. Sylvia Learner, testified that she found Thomas over Mrs. Finkel’s body when she ran into the Finkel house after hearing the hysterical screams. Thomas was wildly stabbing Mrs. Finkel, who lay on the floor on her back. Mrs. Learner returned to the house after Thomas ran out and found Mrs. Finkel in a pool of blood, lying on her stomach after having crawled approximately eight feet from where she was first attacked. Mrs. Finkel cried out for help several times. She was conscious of her suffering; she moaned; she indicated to Mrs. Learner where the telephone was and expended agonizing energy to point toward the phone. When the police arrived, Mrs. Finkel was still conscious, still lying in the pool of blood and was heard by Mrs. Learner to groan and regurgitate blood before the police took her away. While the conscious pain and suffering may have been brief, it was also agonizing. The court awards the sum of $5,000 to the estate of Mrs. Evelyn Finkel on the cause of action for conscious pain and suffering.
*761 With respect to the cause of action for wrongful death, we are guided by the rule of damages requiring the award to compensate for pecuniary loss to the next of kin. (Decedent Estate Law, §§ 130, 132.) In the case of a wife and mother, we are not unmindful that while not awarding damages for sentiment and emotion, a mother’s care, guidance and control with respect to the members of her family is something for the loss of which the family suffers pecuniarily (Matter of Svibruck, 3 Misc 2d 607). In the case at bar, the deceased was a 31-year-old woman in good health, having a husband and two children, a boy, six years old and a girl, almost three years old. She had been graduated from the University of London and had worked during her marriage as a legal stenographer until her first pregnancy; she helped her husband start his business by doing his correspondence, billing, etc.; did her own housework; employed no steady help and made the children’s clothes. She had a life expectancy of 44.05 years according to the United States Life Tables of the Department of Health, Education and Welfare. The court awards the sum of $70,000 for the decedent’s wrongful death together with the sum of $997.45 for funeral and interment expenses for a total sum of $70,997.45, together with appropriate interest thereon.
The claimant’s motion to strike out testimony with respect to the husband’s remarriage is granted (Matter of Saxe, 21 Misc 2d 811).
All motions made by the defendant on trial upon which the court reserved decision are hereby denied.
Apportionment of the sums awarded and counsel fees to be allowed pursuant to section 133 of the Decedent Estate Law, shall be determined by the Surrogate’s Court appointing the administrator.