J. Eugene Goddard, J.
This is a claim brought by Robert L. Horton, individually and as administrator of the goods, chattels and credits of Frances M. Horton, deceased, the wife of said Robert L. Horton. Letters of administration were issued to Robert L. Horton on November 1, 1965 and the above-entitled claim was filed on November 9, 1965. On October 22, 1965, shortly after 10:00 a.m., the decedent was operating a Volvo sedan automobile in a general northerly direction on Route 11 in the Township of Lafayette, Onondaga County, New York, approximately three fourths of a mile south of the State garage. She was alone in the automobile. Route 11 is a two-lane blacktop road and the paved portion is 18 feet 3 inches wide. At this point the road is straight and level. The weather was cloudy and dry.
When at the above location, the Volvo automobile was struck by a Model 134 Trojan tractor shovel, commonly termed a payloader, owned by the State of New York, and operated by its employee, Raymond F. Darby, in a general southerly direction on Route 11. The payloader has a four-wheel drive and is 18 feet long and 7 feet 9 inches in width. As the operator sits in the stationary seat facing forward, there is a 6-foot wide scoop or bucket at the front end of the vehicle. Darby had taken the payloader from the garage and was proceeding to another job some distance south of the scene of the accident. Darby was operating the payloader about 5 to 10 miles per hour in reverse, that is, he was backing it down the highway while he was sitting in the operator’s seat, looking backwards over his left shoulder through the rear view window to observe other traffic and driving conditions. He testified that he had both his hands on the steering wheel and that he could see the left rear wheel of the payloader which he used to guide his steering by keeping it along the west edge of the pavement, “ sometimes more, sometimes less ”. He further testified that he saw the Volvo coming north toward him when it was 1,000 *1019 or 2,000 feet away. He could not say whether he looked more than once, but he never saw the Volvo again. He could not estimate the rate of speed the Volvo was traveling, but he said it was within a lawful speed limit and on its own or right hand side of the road at all times. No other testimony was received further pertaining to the operation of the automobile. He testified further there is a blind spot in front of the payloader when it is backing up and he could not see anything in front of the vehicle. Other testimony was received to show that the hood obstructs the view for at least 15 feet in front of the loader when it is operated by backing.
The operating instruction manual put out by the manufacturer of the Trojan shovel contains the following paragraph: ‘ ‘ tbavellixg without a load in the bucket : "When the machine is taken from job to job, the bucket should be raised about 14" off the ground. The machine can be driven in one of the higher gears to the new job site. Some operators prefer to drive the machine in reverse to get higher speed, with more steering-control. This procedure is not recommended because of the relatively poor visibility of the operator over the rear hood of the machine.”
Expert testimony was also offered to show that the steering mechanism operated on the rear wheels, the front wheels being-immovable. In driving forward, by turning the steering wheel to the left, or counterclockwise, this did not turn the front wheels at all, but turned the rear wheels to the right, causing the vehicle to turn left. By turning the steering wheel to the right, or clockwise, the rear wheels would turn to the left, causing the vehicle to turn right. This offered no problem to the operator because he steered the same as he would any other vehicle. When the vehicle was being operated in reverse, however, the operator was required to do just the opposite because all the steering was done by turning the rear wheels. This causes an optical illusion and in an emergency could have a disturbing effect on the judgment of the operator.
Testimony was also offered to show that the rear window was dirty and cloudy and that the safety glass was fractured.
Darby also testified that on some occasions when a payloader was being backed down a highway, another State truck would precede the vehicle by driving ahead of it. On this time, however, the State truck had gone on so far ahead that it was out of his sight at the time of the crash.
There were no other eyewitnesses to the accident. Darby’s testimony was of little assistance to the court. He said, “I heard a crash and we both came to rest on the east side of the *1020 road ”. Both cars were on the shoulder on the east side of the pavement after the accident. Considerable debris and broken glass were all east of the center line and on the east-shoulder. A burn or skid mark started west of the center line and continued to the rear wheel of the payloader. The State Police who were the first to arrive on the scene made a report that the right rear wheel of the payloader, which would be the left front wheel when it was operated in reverse, had come off before the crash and had rolled across the highway and into the Volvo. Expert metallurgists called both by the State and by the claimant disagreed with this theory and testified that the wheel had come off in the crash and that it did not come off before the accident.
Under all these facts, it is apparent that Darby, the operator of the payloader and the employee of the State was negligent. There is nothing in the record to show any negligence on the part of the decedent, who was killed instantly, and need not show freedom from contributory negligence: “Under settled common-law principles, Cannaughton [the defendant] was charged with the duty of operating his vehicle with reasonable care. Specifically, he was bound to use caution in backing his vehicle, particularly because of its size, and because he iras not able to see its rear at all times.” (De Sessa v. City of White Plains, 30 Misc 2d 817, 823; Gough v. Anson's Dairy, 11 A D 2d 859; Armieri v. Mertens, 245 App. Div. 906.)
The Vehicle and Traffic Law provides as follows:
1 ‘ The driver of a vehicle shall not back the same unless such movement can be made with safety and without interfering with the other traffic.” (§ 1211, subd. [a].)
“ Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.” (§ 1120, subd. 5, par. [b].)
1 ‘ Drivers of vehicles proceeding in opposite directions shall pass each other to the right and upon roadways having width for not more than one line of traffic in each direction each driver shall give to the other at least one-half of the main-traveled portion of the roadway as nearly as possible.” (§ 1121.)
“ Every motor vehicle, when driven or operated upon a public highway, shall be equipped with a mirror or other reflecting device so adjusted that the operator of such vehicle shall have *1021 a clear and full view of the road and condition of traffic behind such vehicle. ’ ’ (§ 375, subd. 10.)
Having decided that the claimant is entitled to recover damages from the State of New York, we now come to the question of how much this award shall be.
The Decedent Estate Law (§§ 130-132) provides that damages may be such sum as is deemed to be a fair and just compensation for the pecuniary injuries, resulting from the decedent’s death, to the person or persons for whose benefit the action is brought.
The statute provides that recovery is limited to what the jury or the court as the trier of the fact shall be guided by his own good sense, experience and discretion in estimating what these damages shall be. (Liddie v. State of New York, 190 Misc. 347; Oddo v. Paterson Bridge Co., 219 App. Div. 518.)
Each case clearly depends upon its own peculiar state of facts. (Liubowsky v. State of New York, 260 App. Div. 416, affd. 285 N. Y. 701; Sutherland v. State of New York, 189 Misc. 953.)
The amount of the damages depends upon the value of the reasonable expectation of pecuniary benefits from the continuance in life by the decedent to the husband and next of kin. (Dimitroff v. State of New York, 171 Misc. 635; Gaccione v. State of New York, 173 Misc. 367.)
It has been indicated that the word ‘ ‘ pecuniary ’ ’ is not used In the statute to the immediate loss of money or property. If that were so there is scarcely a case where any amount of damages could be recovered. It looks to prospective advantages of a pecuniary nature which have been cut off by a premature death of the person from whom they would have proceeded. (Tilley v. Hudson Riv. R. R. Co., 24 N. Y. 471.)
Courts have held that there is no mathematical formula upon which an award of damages for wrongful death may be based, specifically rejecting:
1. Sentiment, grief, loss of society and suffering of survivors. (Arnold v. State of New York, 163 App. Div. 253; Costello v. Buffalo Gen. Elec. Co., 183 App. Div. 48; Dimitroff v. State of New York, 171 Misc. 635; Grasso v. State of New York, 177 Misc. 690, affd. 264 App. Div. 745, affd. 289 N. Y. 552; Lewis v. State of New York, 234 N. Y. 587; Sternfels v. Metropolitan St. Ry. Co., 73 App. Div. 494, affd. 174 N. Y. 512.)
2. The amount of money a decedent could have earned during his possible lifetime as indicated by his life expectancy, nor the amount required to purchase an annuity for his expected lifetime. (Liddie v. State of New York, 190 Misc. 347; Hinsdale *1022 v. New York, New Haven & Hartford R. R. Co., 81 App. Div. 617; Mix v. Hamburg-Amer. S. S. Co., 85 App. Div. 475; Dibble v. Whipple, 281 N. Y. 247.)
3. Anticipated increase in earnings. (Matter of Reynolds, 115 N. Y. S. 2d 534.)
The courts have repeatedly held that the pecuniary loss in an action for wrongful death may be composed of very different elements. It may consist of special damages, that is of an actual, definite loss, capable of proof, and of measurement with approximate accuracy; and also of prospective and general damages, incapable of precise and accurate estimate because of the contingencies of the unknown future.
“ The damages to the next of kin in that respect are necessarily indefinite, prospective and contingent. They cannot be proved with even an approach to accuracy, and yet they are to be estimated and awarded, for the statute has so commanded. But even in such a case there is and there must be some basis in the proof for the estimate, and that was given here and always has been given. Human lives are not all of the same value to the survivors.” (Houghkirk v. President, etc. of Delaware & Hudson Canal Co., 92 N. Y. 219.)
That this method of proof is slender and inadequate is true, but it is all that is possible and while it should be used, more cannot be required. The main elements to be considered are the age of the decedent, health, habits, qualities, intelligence, expectation in life, earning ability, income, the prospect of increased income, the number, age, sex and situation of those dependent upon him for support and his disposition to support them well or otherwise. (Sider v. General Elec. Co., 238 N. Y. 64; Finkel v. State of New York, 37 Misc 2d 757; Webster v. State of New York, 19 A D 2d 851; Matter of Svibruck, 3 Misc 2d 607; Lucivero v. Long Is. R. R. Co., 22 Misc 2d 674; Eder v. Cashin, 281 App. Div. 456.)
To aid in the determination of life expectancy in wrongful death cases, the most recent life tables may and should be used. The United States life tables have been approved by the courts many times and the American Experience Table has been condemned by the courts in many eases. (Matter of Shecora, 201 N. Y. S. 2d 191; Matter of Vacca, 42 Misc 2d 120.)
A comparatively recent trend in an action for wrongful death of a woman survived by children is the assessment of damages under the so-called substitute wife-mother theory. There are several cases which allow the expert testimony by one qualified in the field of domestic service agencies and hold it is competent *1023 evidence of damages for the wrongful death of a housewife. (Weiss v. Rubin, 11 A D 2d 818; Zaninovitch v. American Airlines, 47 Misc 2d 584; Connie’s Prescription Shop v. McCann, 316 P. 2d 823 [Okla.]; Lithgow v. Hamilton, 69 So. 2d 776 [Fla.]; Merrill v. United Airlines, 177 F. Supp. 704 [U. S. Dist. Ct., S. D., N. Y.].)
Apparently, there appears to be a difference of opinion as to whether such damages are recoverable in an action where proof is offered that such services are necessary, but there is no evidence that such services have actually been performed. Such is the problem in this case, although there was testimony that some outside help was employed. The court is of the opinion that weight should be given to this testimony in the assessment of damages as to do otherwise would deprive a claimant of his just damages for services which should be performed, and no doubt will be performed, as soon as the funds for the cost thereof become available. To hold otherwise, would be to penalize a claimant because he had insufficient personal funds to provide such services pending his trial, while reimbursing a claimant who was more favorably situated financially. Certainly future services of this nature should be compensable just as future medical services are allowed.
Formerly, the courts refused to allow damages for loss of use of a (negligently damaged) automobile unless the owner actually rented a replacement vehicle during the repair interval. The rule today is to allow such damages irrespective of whether a replacement vehicle is rented.
“ Surely it would be unjust to compel the owner of the car to hire another car in order to entitle him to claim compensation for the loss of the use of his own car. He might, for example, not be financially able, or have sufficient credit to hire a car.” (Naughton Mulgrew Motor Car Co. v. Westchester Fish Co., 105 Misc. 595, 599.) (See, also, Pittari v. Madison Ave. Coach Co., 188 Misc. 614.)
The People approved an amendment to our State Constitution in 1938 which provides: “ The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation.” (N. Y. Const., art. I, § 16.)
A right of action existing at any time is not “abrogated” within prohibition of this section against abrogation of existing rights of action to recover damages for injuries resulting in death and against the limitation of the amount recoverable, so long as the facts which give rise to the right of action which *1024 must be proved to maintain the action are unchanged. (Sutherland v. State of New York, 189 Misc. 953; Matter of Meng, 227 N. Y. 264.)
There is no doubt that this provision was placed in the Constitution to restrain any action by the Legislature to abrogate such actions, or to impose a ceiling on the amount recoverable as was the $5,000 limit under the former law. Although the judiciary has the power to modify verdicts in such actions, it would appear reasonable to conclude that this provision might also cause the judiciary to hesitate taking a course of action which would reduce or abrogate such a cause of action and the damages recoverable therein. If the courts are to take a position that the affluent who have funds to provide such care can be reimbursed for such damages, but that those less fortunately situated who have no funds available are not entitled to the services of a substitute wife-mother, it would appear that such a holding would be unconstitutional.
The damages sustained in an action for wrongful death accrue to the next of kin at the very moment that death occurs. If at that moment, the claimant suffers a loss of which he is entitled to damages, the wrongdoer is liable for those damages and ‘ ‘ the cost to cure ” regardless of the time when such cure is effected.
For many years, our courts and juries have placed what seems in retrospect to be a small or minimum value on the damages sustained to the next of kin on the death of a wife and mother. It has only been in the last two decades that our courts have come to recognize the true value of a housewife and the services she performs.
“ The frugality, industry, usefulness, attention and tender solicitude of a wife and the mother of children, surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value.” (Pennsylvania R. R. Co. v. Goodman, 62 Pa. 329, 339. See, also, Legare v. United States, 195 F. Supp. 557 [U. S. Dist. Ct., S. D., Fla.]; Spangler v. Helm’s N. Y. Pittsburgh Motor Express, 396 Pa. 482.)
In arriving at a fair and reasonable award, the court must take into consideration the present value of the dollar. “In determining the pecuniary loss sustained by the decedent’s wife, attention has been called to prior adjudications of this and other courts. While they may offer some guide in fixing the amount, this court is indeed mindful of the sharp devaluation of the dollar between the times of the decisions of yester *1025 year and today. It does not require the recitation of statistics and governmental compilations to establish an acknowledged fact; that the purchasing power of the dollar has greatly diminished in recent times. Such factor has been borne in mind in making the award herein.” (Burtman v. State of New York, 188 Misc. 153, 156. See, also, Dimowitz v. New York City Tr. Auth., 34 Misc 2d 29; Rothman v. Rosenberg, 4 N Y 2d 969; Oddo v. Paterson Bridge Co., 219 App. Div. 518; Mullen v. Fayette, 274 App. Div. 527, affd. 300 N. Y. 501; Neddo v. State of New York, 194 Misc. 379, affd. 275 App. Div. 492, affd. 300 N. Y. 533.)
Among the recent decisions where substantial amounts were awarded for the death of a wife are the following: Zaninovich v. American Airlines (supra, 1966); Fabrizi v. Griffin (162 F. Supp. 276 [U. S. Dist. Ct., W. D.. Pa., 1958]); Josephson v. Wilbrew (15 A D 2d 533 [1961], affd. 12 N Y 2d 930); Weiss v. Rubin (11 A D 2d 818 [1960], affd. 9 N Y 2d 230); Finkel v. State of New York (37 Misc 2d 757 [1962]); Connie’s Prescription Shop v. McCann (316 P. 2d 823 [Okla., 1957]); Legare v. United States (195 F. Supp. 557 [U. S. Dist. Ct., S. D. Fla., 1961]); Lithgow v. Hamilton (69 So. 2d 776 [Fla., 1954]); Southeastern Aviation v. Hurd (355 S. W. 2d 436 [Tenn., 1962]); Wieting v. International Marketing (Dist. Ct., Victoria County, Texas [1964]).
The decedent, Frances Horton, was 49 years of age. She was survived by her husband, Robert Horton, age 55, her natural daughter, Barbara Horton, age 17, and her natural son, Wayne Horton, age 26, an adult.
The decedent was a housewife and was also systematically and regularly employed at the time of her death. As a housewife, she performed the usual and natural functions in maintaining a seven-room house; she did all of the laundry, general housecleaning, shopping, cooking, baking and fulfilled every duty of a good wife and mother. She did all the work herself, employing no outside help. She was a high-school graduate and was of the highest moral character and attended the local Episcopal Church regularly and gave religious guidance to her daughter, Barbara. Decedent was in excellent health. She played golf regularly with her husband and belonged to two league bowling teams and was active in community and the local firemen’s women’s auxiliary.
Mrs. Horton was employed as a cleaning lady in the Lafayette Central School System from April 9, 1958 until her death on October 22, 1965. She worked on a full-time basis during the *1026 Summer months and part time during the school year. Her cleaning job in the school amounted to approximately 1,200 hours per year. At the time of her death, she was earning $1.4-0 per hour. The Board of Education had a wage increment policy under which she should have been entitled to an increase to $1.50 per hour in 1966 and $1.60 per hour in 1967. Her immediate supervisor testified that she was a good worker and had established a good merit rating over her 7-year working period and would have been entitled to merit increases. In the year preceding her death, she had received $1,600.87 for her work at her cleaning job.
In the year of her death, Frances Horton had also taken on the additional job of driving a school bus for the school system in an effort to aid in the payment of family expenses, help pay her husband’s medical bills and to save for the future planned education of her daughter, Barbara. For this work, she was paid the additional sum of $50 per month during the school year, which increased her annual wages $450 to $500 per year. According to the school records, she had earned in 1965, $1,460.29 up to the time of her death in October. From the testimony it is reasonable to assume her earnings in 1966 would be no loss than $2,130, and in 1967, $2,370 per year. Her normal life expectancy was 30 years.
Robert L. Horton, the husband of decedent, also was employed by the Lafayette Central School System for the past nine years. He was a carpenter and cabinetmaker, drove a school bus and also did maintenance and custodial work. He had a close relationship with his wife and was dependent upon her for partial support because of his physical condition. He has been under the care of a doctor for a back condition since 1956 and has had several operations. One fusion operation was unsuccessful and a second operation was performed on him on October 22, 1965, the morning of his wife’s death. She was driving to the hospital at the time of the accident. The doctor testified he had' ordered bim not to do any work for at least six months after the operation. His opinion is that Horton can return to his former duties, but he will never be able to do any heavy lifting or repeated bending. He further testified that this condition would not decrease his normal life expectancy of 20.45 years.
Barbara Horton was the daughter of the deceased; she was 17 years old on April 7, 1965. She is a senior in the high school and has been accepted for this Fall’s term as a student in a business college for a two-year course. Testimony showed she was still in her adolescence and depended a great deal upon *1027 her mother, with whom she enjoyed a very close attachment and warm relationship. The mother took an active interest in her daughter’s social and educational activities. For three years, she drove her each week to and from her piano lessons.
Dr. Lionel C. Lane, who is the executive director of the Child and Family Service, a Bed Feather social agency in the City of Syracuse, testified on the need and cost of a substitute wife-mother. He had interviewed the husband and daughter and had examined the family background. In his expert opinion, which was uncontroverted, the family would require a homemaker to act as substitute mother and the minimum fair and reasonable cost would be $84 per week until Barbara became 20 years of age. In addition, a domestic would be required for at least four hours a day at $1.25 per hour for the balance of Bobert Horton’s life, or for 20.45 years. These estimates did not include the cost of meals, social security, compensation and unemployment insurance, substitute domestic service during vacations, or transportation costs.
These are bread and butter figures. The services rendered by a domestic and a homemaker fall far short of the true pecuniary loss of a wife and mother. In addition, we must also take into consideration the potential earnings Frances Horton would have received from her employment. Bobert Horton is now 55 years of age and we assume he has 20 years ahead of him, 20 years for which we seek to evaluate his pecuniary damages.
As Judge Goublay said in the Fabrizi case (162 F. Supp. 276, 279, supra): “ This companionship is the elixir of life to the youth and to the middle-aged, but it is the necessity of life, as oxygen is to the air, to those who are treading the pathway of life in the later years of one’s existence on this earth.”
Following these well-settled authorities and taking into consideration the various elements disclosed by the record of the trial of this claim, we arrive at the sum of $60,000 as the amount of recovery herein to which claimant is entitled by section 132 of the Decedent Estate Law upon our finding of negligence herein. To this sum must be added the amount of the following: Funeral expenses, $1,296.65; ambulance service, $16; loss of vehicle, $617, and interest from October 22, 1965 to the date of entry of judgment herein.