Albert A. Blinder, J.
These are tort claims to recover for personal injuries sustained by Yolanda Rodriguez, a patient at Willowbrook State School, Staten Island, New York, on April *175 18,1971. The claims were filed by her mother, Elba Rodriguez, as mother and natural guardian and individually.
Yolanda Rodriguez is a profoundly retarded girl who was, at the time of the alleged incident, five years old. She had ah estimated I.Q. of 5 and was paraplegic and spastic. Her condition was diagnosed as hydrocephalic[1] and spina bifida.[2]
The infant was not able to sit, crawl or take care of her needs. She could not move her legs in any degree, but could move her arms. When placed on a surface, Yolanda could not turn over, nor could she move forwards or backwards. She was incapable of changing her position but would stay quiet where she was placed.
The first indication of Yolanda’s injury, according to statements and an accident report subsequently dated, was at 12:30 a.m. on April 18,1971 When an attendant checking her temperature noticed what appeared to be a little swelling on the left thigh. At 6:00 a.m., the attendant checked again and the swelling looked more definite. The Department of Mental Hygiene’s “ accident or injury report ” reveals that prior to this discovery the child was last examined at 3:15 p.m., April 17, 1971, when she was fed and given her evening care. At that time, the attendant stated in her statement that Yolanda did not appear uncomfortable nor did she have swelling or discoloration of the left knee. At the end of her shift, 11:30 p.m., she made the same observations.
Elba Rodriguez, the child’s mother, visited her daughter on April 18, 1971, which was a Sunday. She saw that her daughter’s leg was “ shiny and red ” and that Yolanda was crying.[3] She told an attendant about this and then a doctor who appeared on the scene and examined the child. On the 19th of April, 1971, X rays were taken of the leg and it was disclosed that Yolanda had suffered a supracondylar fracture of the lower left femur.[4]
*176 The child was located in a building which had four wards. There were about 40 children in each ward at the time of the incident with two or three nurses who would rotate between the various wards. During the night, there, would be only two nurses to cover four entire buildings. In addition to the nurses, there would be four attendants in the morning, three in the afternoon, and two in the evening, all in each ward.
Yolanda was nonambulatory and most of the time she was in bed. The ward where she was housed was occupied by ambulatory and nonambulatory children.
Yolanda’s mother, testified that she observed several occasions when there were no attendants in the ward. She also stated that on at least three separate occasions children from other wards would wander in.
This is the sum total of the evidence. The State offered no defense and moved to dismiss because the claimants failed to prove a prima facie case and because of the failure of the claimants to sustain their burden of proof by a fair preponderance of the credible evidence.
The. child clearly is non sui juris. She cannot provide any evidence of the occurrence which caused her injury. The examination before trial is likewise unrevealing as to how the injury happened. The statements taken from the attendants and the accident or incident report contained in the hospital record only recite the facts pertaining to their alleged discovery of the fracture by the hospital staff.
The claimants’ counsel candidly conceded that the claimants are unable to make any specific allegation as to the causation of the fracture and asks the court to apply the doctrine of res ipsa loquitur.
The attorney for the defendant, in her well-prepared brief, argues that the aforesaid doctrine is not applicable to the case at bar.
Res ipsa loquitur has been termed an uncertain doctrine which has been the source of . so much trouble to the courts that the use of the phrase itself has become a definite obstacle to any clear thought.[5] (Prosser, Torts [4th ed], § 39.)
The doctrine of res ipsa loquitur means “ that certain occurrences contain within themselves a sufficient basis for an inference of negligence ”. (Foltis, Inc. v. City of New York, 287 N. Y. 108, 116.) The doctrine applies where it is improbable that the accident would have happened if reasonable care had been exercised and the defendant had control of the agency *177 producing the injury. (Neuhoff v. Retlaw Realty Corp., 289 N. Y. 293; Foltis, Inc. v. City of New York, supra; Massa v. Nippon Yusen Kaisha, 264 N. Y. 283.) The doctrine means merely that the facts of the occurrence permit the inference Of negligence, not that they compel it, and whether the inference should be drawn is a question which must be left to the jury. (Richardson, Evidence [10th ed.], § 93.) In this forum, the court decides this question.
The claimants have requested that the court take judicial notice of the unsatisfactory conditions prevailing at the Willowbrook State School on the basis of newspaper reports and investigations. While the court may take judicial notice of facts which are notorious (Richardson, Evidence [10th ed.], § 9) we need not resort to such reports since an excellent source of information on the conditions of Willowbrook School is found in New York State Assn. for Retarded Children v. Rockefeller,[6] 357 F. Supp. 752. The court will take judicial notice sua sponte of the New York State Assn. for Retarded Children decision (hereafter referred to as the Willowbrook decision). (CPLR 4511; see George v. Time, Inc. 259 App. Div. 324, affd. 287 N. Y. 742.)
In the Willowbrook decision, Judge Judd found, inter alia, that:
“ In spite of legislative reports dating from 1964, which complained of overcrowding and inadequate staffing at Willowbrook, conditions are still inhumane. The institution has not yet recovered from a hiring freeze which prevented even the replacement of departing staff members from December 1970 until November 1971 and prevented the hiring of any additional staff until January 1972. * * *
“ Testimony of ten parents, plus affidavits of others, showed failure to protect the physical safety of their children, and deterioration rather than improvement after they were placed in Willowbrook School. The loss of an eye, the breaking of teeth, the loss of part of an ear bitten off by another resident, and frequent bruises and scalp wounds were typical of the testimony. During eight months of 1972 there - were over 1,300 reported incidents of injury, patient assaults, or patient fights.
“ The number of ward attendants is below the level which even the Director of Willowbrook thinks proper, and unauthorized absences worsen the shortage. There are only half the number of doctors that are needed, and nurses, physical thera *178 pists, recreation therapists, and other professional staff are in short supply. * * *
“ Physical maintenance is poor, with a backlog of 750 work orders and at least one toilet inoperative in every battery of toilets.
“ These conditions are hazardous to the health, safety, and sanity of the residents. * * * A most striking deficiency is .the inadequate coverage of dayrooms, where the ratio is frequently 15 or more residents per attendant on duty even for profoundly or severely retarded residents.
“ Over three-fourths of the residents of Willowbrook are profoundly or severely retarded, and would require resident care personnel in the ratio of 1:5 for the first shift, 1:7 for the second shift, and 1:15 for the third shift, to comply with the 1964 A.A.M.D. Standards.” (New York State Assn. for Retarded Children v. Rockefeller, 357 F. Supp. 752, 756, supra.)
At the risk of citing platitudes, it is necessary to discuss the basic legal questions confronting the court in considering the defendant’s motions. Case law has held that the State is not an insurer of the health of its patients (Hirsh v. State of New York, 8 N Y 2d 125; Soto v. State of New York, 39 A D 2d 993; Robinson v. State of New York, 17 Misc 2d 775), but the State owes to patients in its institutions a duty to exercise every reasonable care to protect them from injury, self-inflicted or otherwise. The degree of care should be measured by the physical and mental ailment of the patient known to the State and by his capacity to provide for his own safety. (Weihs v. State of New York, 267 App. Div. 233; Jones v. State of New York, 267 App. Div. 254; Shattuck v. State of New York, 166 Misc. 271, affd. 254 App. Div. 926; Gaccione v. State of New York, 173 Misc. 367.)
The State is not responsible for failure to guard against the remote possibility of an accident, and it is responsible, in the operation and management of its institutions, only for hazards reasonably to be foreseen. (Hawley v. State of New York, 16 N Y 2d 809; Flaherty v. State of New York, 296 N. Y. 342.)
It is also clear that negligence cannot be presumed from the mere happening of an accident and it is incumbent upon the part of claimants to show affirmatively by competent evidence that the injury complained of was caused by reason of some breach of duty on the part of the State. Negligence must be proven. (Van Barneveld v. State of New York, 35 A D 2d 900; Kowalski v. State of New York, 7 A D 2d 762; McCabe v. State of New York, 190 Misc. 11, affd. 273 App. Div. 1048.)
*179 Furthermore, in order to succeed, a cause of action must be based on more than speculation. If there are several possible causes of injury, for one or more of which the defendant is not responsible, the plaintiff cannot recover without proving that wholly or. in part the injury was sustained by a cause for which the defendant was responsible. (Digelormo v. Weil, 260 N. Y. 192, 199-200; Schwartz v. Macrose Lbr. & Trim Co., 29 A D 2d 781, affd. 24 N Y 2d 856; Morales v. Kiamesha Concord, 43 A D 2d 944.)
The defendant’s citations as to the nonapplication of res ipsa loquitur have been helpful. The court has carefully read Barry v. State of New York (27 A D 2d 593); Shanon v. State of New York (29 A D 2d 1024); and La Plante v. State of New York (31 A D 2d 570). In each of these cases, the Appellate Division ruled that the doctrine would not apply because it was equally as probable that the injured parties had injured themselves on their own without any fault of the State and therefore there had been no showing that the instrumentality which caused the injury was in the State’s exclusive control. In Soto v. State of New York (39 A D 2d 993, 994) the Appellate Division again reversed a finding for the claimant based on an application of res ipsa loquitur in a wrongful death action, stating “ there is nothing in the record establishing that the State had exclusive control of the thing which caused decedent’s illness and resultant death. * * * Since decedent’s death might well have been the natural culmination of her condition, notwithstanding any treatment which she received, it would be an improper inference to attribute her death to negligence on the part of the State.” Our research also disclosed the case of Minotti v. State of New York (6 A D 2d 990) which reversed a decision based on the doctrine holding in essence, as was held in the above cases, that there was lacking proof that the injured party was not contributorily negligent in any way.
As a matter of law, the court finds that the infant claimant could not possibly be contributorily negligent (Mochen v. State of New York, 43 A D 2d 484, citing Suprenant v. State of New York, 46 Misc 2d 190; Doty v. State of New York, 33 Misc 2d 330; Zajaczkowski v. State of New York, 189 Misc. 299; Gaccione v. State of New York, 173 Misc. 367).
We find the doctrine of res ipsa loquitur applicable to the case at bar; that the State was under an affirmative duty to provide care and treatment of high quality and effectiveness as mandated by law (Mental Hygiene Law, § 7.05, subd. [c] )[7] and *180 that a fair preponderance of evidence shows that the State "breached this duty. (See Santana v. State of New York, 28 A D 2d 576.)
"We also find that the evidence indicates the mishap occurred due to an instrumentality over which the State had total control. Whether the instrumentality be the act of an attendant or of a fellow patient (the only two probabilities presented by the facts[8]), we hold the State responsible for either.
As to cases involving attendants, see Bennett v. State of New York (59 Misc 2d 306); Sarlat v. State of New York (52 Misc 2d 240); Gerbino v. State of New York (201 Misc. 3). As to cases involving fellow patients, see Scolavino v. State of New York (297 N. Y. 460); Dowly v. State of New York (190 Misc. 16); Zajaczkowski v. State of New York (189 Misc. 299); Tabor v. State of New York (186 Misc. 736). Compare the above cases with Hirsh v. State of New York (8 N Y 2d 125); Flaherty v. State of New York (296 N. Y. 342).
The claimants need not establish which instrumentality caused the injury. (Ruback v. McCleary, Wallin & Crouse, 220 N. Y. 188; Messing v. State of New York, 197 Misc. 907.) The claimants’ case need not exclude every other possible cause. (Rosenberg v. Schwartz, 260 N. Y. 162; Stubbs v. City of Rochester, 226 N. Y. 516; Foley v. State of New York, 294 N. Y. 275.)
The damages sustained by this helpless infant were entirely foreseeable by the State and it has failed in its responsibility to her.
We are aware of the cases which hold that the State is not the insurer of its patients and need not constantly watch them. Yet, in the situation that confronts this court, the better rule is that when the State is charged with the duty to exercise every reasonable care to protect its ward, who is a totally helpless infant, unable to take care of any of her needs or be responsive to any danger which may confront her, the State is charged with exercising the highest standard of care in its guardianship. Whether this degree of care be akin to that of an insurer, we need not inquire. It is, however, painfully evident that the State cannot successfully defend without some explanation.
In ascertaining damages, the court has been confronted with a most difficult task. Yolanda could never be expected to walk; *181 she is a five-year-old spastic, paraplegic child who was profoundly retarded. This injury could cause no further permanent damage than that which already was present to her legs. There is very little demonstrative evidence in the record which would assist the court, other than the testimony of Elba Rodriguez, Yolanda’s mother, that when she saw her daughter on April 18, 1971, she was crying.
The court has no doubt, as the law has consistently found, that Yolanda did suffer pain,[9] as Judge Greenberg succinctly stated in Gallachicco v. State of New York (43 N. Y. S. 2d 439, 442): “ Persons of a low mentality suffer no less than their intellectual superiors. It was very aptly stated by my learned colleagues in Johnsen v. State, 176 Misc. 347, 27 N.Y.S. 2d 945, 948: ‘ His unfortunate mental condition did not alleviate his physical pain. ’ ” (Also, see, Scolavino v. State of New York, 187 Misc. 253, 262.)
The court limits its consideration of damages to those attributable to pain and suffering and “ With respect to it, no precise rule can be formulated either to measure the pain or to compensate for it in money damages. ’ ’ (Wolfe v. General Mills, 35 Misc 2d 996, 1000, citing Robison v. Lockridge, 230 App. Div. 389.) The element of pain and suffering will vary from case to case and is primarily a matter of credibility for the trier of the facts in light of all the evidence in the particular case. (Van Ullen v. Grazadei, 26 A D 2d 606; Paley v. Brust, 21 A D 2d 758.)
The court awards $3,000 as damages for pain and suffering to Elba Rodriguez, as mother and natural guardian of infant, Yolanda Rodriguez.
In considering the claim of Elba Rodriguez as an individual, the court is aware that she expended no sums of money to correct Yolanda’s injuries nor have any other expenses been set forth which the State’s negligence caused her to pay. She has not been denied the services of her daughter because her daughter could not provide any services as the same are defined by our common law.
While there is little doubt that Mrs. Rodriguez was anxious about the condition of her child, suffered due to such anxiety (which no doubt in turn caused her pain which in our view was akin to the pain and suffering she might have suffered had her own leg been broken), and while the testimony indicates that *182 she is a mother who has shown profound affection by th'e care and attention she has lavished upon her afflicted daughter, she does not have a cause of action under which she may individually recover damagés.
It is true that “ In many instances, just as in impact cases, there will be no doubt as to the presence and extent of the damage and the fact that it was proximately caused by defendant’s negligence” (Battalla v. State of New York, 10 N Y 2d 237, 242), nevertheless, the court is precluded from awarding damages to the child’s mother.
It is concluded that under the well-established applicable doctrines no cause of action lies for unintended harm sustained by one solely as a result of injuries inflicted directly upon another, regardless of the relationship. (Tobin v. Grossman, 24 N Y 2d 609, 611.)
This court must follow thé thrust of the Tobin decision which indicates no new cause of action may be created allowing a claimant who sustains an indirect injury of an emotional nature under circumstances as found in the case at bar. (Johnson v. State of New York, 44 A D 2d 151.)
The court, therefore, grants the defendant’s motion to the extent of dismissing the claim asserted in behalf of Elba Bodriguez, individually.

. Hydrocephalus is “ a condition, occurring usually in infants, marked by an abnormal increase in the fluid (cerebrospinal fluid) which is normally present in small amounts in and around the brain. As a result, the small cavities within the brain become distended, i.e., the ventricles become enlarged. The pressure of the fluid between the brain and cranium causes the brain tissue to shrivel up and the skull to become enlarged, especially in the region of the forehead ” (Schmidt’s Attorneys’ Dictionary of Medicine).

. Spina bifida is “ a congenital defect in the development of the spine which' leaves the canal open at some point ” (Ibid).

. The evidence allows a finding that this may have been the first discovery of the injury.

. Break of the condyle at the lower end of the bone of the thigh. (Schmidt’s Attorneys’ Dictionary of Medicine.)

. Dean Prosser suggests that it might better be discarded entirely. (Ibid.)

. We note that the State was a party to this litigation.

. Revised, old section 7 of the Mental Hygiene Law.

. We have rejected the possibility that the injury might have been caused by a visitor because of the lack of any proof thereof and because we believe that the State likewise was under a duty to supervise the hours of visitation, as well as the behavior of visitors, if any. Moreover, the hospital record indicates that the first visible symptoms of the injury occurred at a "time when visitation was prohibited.

. It may very well be that this infant suffered to a greater extent than a normal child would, failing to comprehend the source of the pain. The court, however, cannot conjecture on this for purposes of assessment of damages.