OPINION OF THE COURT
Jeremiah J. Moriarty, J.
This is a claim for personal injuries sustained by the claimant Robert C. Giles, while he was an inmate of the Attica Correctional Facility at Attica, New York.
It is alleged that the claimant’s injuries were caused by the negligence of the State of New York and its agents and employees in failing to provide him with a reasonably safe *330 place to work; and in failing to properly and sufficiently instruct and train the claimant in the duties he was to perform, and in particular, in failing to provide restraining devices or other proper safeguards which would protect workers from injuries inflicted by livestock.
There is an additional claim that the State of New York, its employees and agents failed to provide prompt and competent medical service for the claimant following the injuries he suffered. However, this portion of the claim was not pursued on the trial, nor is there any evidence to substantiate it, and it is therefore dismissed.
The claimant filed his claim timely, and his version of this accident was related in his testimony, and that of Arthur J. Grabowski, another inmate.
The claimant entered Attica Correctional Facility on November 10, 1972, and was paroled therefrom on November 19, 1973. At his request, and on or about February 23, 1973, he was assigned to work at the dairy farm operation at the facility. He was then 49 years of age, and prior to his incarceration was a long time steady employee of the Republic Steel Corporation in Buffalo, New York. A city dweller all of his life, he had no training or experience in farm work, and more particularly no experience in the handling of dairy cattle.
He was assigned to work in a building designated as Barn No. 2 to care for calves and Holstein heifers housed therein. Part of the barn was equipped with pens in which the calves were confined. It also had eighteen tie stalls where heifers up to six months old were restrained so that they could not move about freely. These animals were restrained by means of a chain around the neck, which chain was then secured to a chain in place in the stall, which arrangement permitted the animal to lie down and get up, and have a certain amount of freedom in a vertical plane.
The claimant’s duties consisted of feeding the animals, cleaning the stable, and making certain that the animals were restrained. He fed milk to the calves and grain and hay to the large animals.
As the animals were restrained in the tie stalls, nine on each side, they were facing the outer walls of the build *331 ing. One could walk behind them, and there was a narrow passageway or walkway in front of each row of stalls, so that the feed could be placed in front of them. It is the contention of the claimant and Mr. Grabowski that, although the proper method of securing the heifers was by the neck chain as previously mentioned, there were not sufficient chains to fit each animal. In place of, and instead of, the chain, it is claimed that they were instructed by the facility supervisory employees in charge of operating the dairy facility to fashion a restraint from used baler twine, from bales of hay previously fed to the animals. These inmates did not consider this method to be safe and state that this was reported to one Richard Holbrook, then the farmer at the operation. Claimant contends that Mr. Holbrook showed him how to fashion the restraint from this baler twine. Because the type of restraint was ineffective, the heifers were able to slip out of it, and this had previously happened, and Mr. Holbrook was so advised.
On April 30, 1973, the date of the accident, the claimant states that he was going about his work and duties in the barn, feeding the livestock when one of the heifers, secured with the baling twine, broke loose and started to run around. This animal started to enter the narrow walkway in front of the other animals, and the claimant was endeavoring to prevent the animal from getting into that narrow area where it would be very difficult to remove it. In this effort, he states that he entered into an area between two tie stalls, and on his left was a large six-month-old heifer weighing about 500 pounds. He leaned or reached over the railing of the stall and waved his hand and raised his voice to head the loose heifer off, and the large animal on his left reared up and came down on him with her front hoofs, striking his neck and shoulders. The heifer which struck him was chained. There were no witnesses to this occurrence, but claimant’s cries for assistance were answered, and other inmates came and picked him up, and retrieved the loose heifer. He indicated that he reported the incident to many people including the correction officer present, and Mr. Grabowski who was then acting as the clerk of the dairy operation.
Although Mr. Grabowski testified that he was assigned *332 to the farm in March of 1972 and became clerk the latter part of 1972 or early 1973, the records of the facility definitely establish that he first worked at the dairy farm on April 6, 1973, some three weeks prior to this incident. Because he was born and raised in the stockyard section of the east side of the City of Buffalo, Mr. Grabowski claims to have broad knowledge of the care and handling of heifers and cows. He stated that there were no written rules or regulations with reference to the claimant’s duties, nor was he ever instructed in the proper method of handling the animals. This witness often saw animals with the neck restraint fashioned from baler twine, and often found heifers running loose. He also states that there were not sufficient chains for all the animals and that Mr. Holbrook was so notified by him.
The claimant produced as an expert witness one Richard L. Hall of Eden, New York, a doctor of veterinary medicine since 1947. In addition to practicing his profession wherein he treats similar animals, Dr. Hall owns and operates a dairy farm where he has Holstein cattle similar to those involved in this situation. Dr. Hall verified the proper method of restraining heifers to be the chain previously described. In his professional opinion, used baler twine was an improper and unsafe method, and not only was it insufficient to restrain a large animal, it also could, and generally would, do damage to an animal. It was also his opinion and judgment that any new employee on the dairy farm should be given complete instructions as to the handling of the livestock, and more particularly young stock. He states that instruction should be given not to excite the animal, not to move quickly within its vision, to never turn your back on some of these animals, and to be very cautious around them at all times.
At the date of this incident, the farm manager at the Attica Correctional Facility was one Ivan Boss, the position of head farmer was occupied by one Robert Durfee, and the category of farmer was possessed by Richard Holbrook. In the pretrial procedures, the deposition of Robert Durfee was taken at the facility on June 24, 1976. Unfortunately, Mr. Durfee died on February 20, 1979 and was not available to testify. His deposition, or portions of *333 it, were read into the record. Both Messrs. Boss and Holbrook testified, and countering the claimant’s proof, they all testified that there were 18 chains available in the barn for the heifers that were restrained there, and that there were always spare chains in the farm office. All maintained that they never observed any heifers restrained with twine, nor were they aware of that or any other type of restraint except the chains. They denied that any one of them received any complaints from either this claimant or Mr. Grabowski concerning the restraints, nor were they aware of any previous similar occurrence or injury. Mr. Holbrook did concede on cross-examination, that heifers are playful, will jump, and can be frightened.
But he also maintains that the Holstein breed is a tame animal, that all the animals on the farm were tame, and accustomed to being around people at all times. They were daily released from their stalls to go outside and exercise.
Claimant offers alternative theories of liability, the theory of strict liability as well as that of negligence. The State takes the position that strict liability does not apply to a domestic animal, that the claimant has failed to establish lis freedom from contributory negligence, that the State /as not negligent in any respect.
The majority common-law rule imposes absolute liability oi the owner, harborer, or keeper of a wild animal that inflicts injury. As contrasted to domestic animals (domitae naturae), wild animals (ferae naturae), are those species of animals that, as a matter of common knowledge, are naturally ferocious, unpredictable, dangerous, mischievous, or, as defined by the Restatement of Torts 2d (§ 506, subd [1]): “not by custom devoted to the service of mankind at the time and in the place in which it is kept.”
Subdivision (2) of the same section of the Restatement defines a domestic animal as: “an animal that is by custom devoted to the service of mankind at the time and in the place in which it is kept.”
Although liability for the keeping of a wild animal seems absolute, this is not true in the case of domestic animals. The more commonly stated definition of domestic animals *334 relates to temperament rather than function, and describes them as animals whose species as a whole have proved themselves to be naturally harmless and docile through many years of association with the homes and household affairs of man. Most farm animals fit within this category.
The same theories of negligence usually do not apply to owners of domestic animals, thus requiring the plaintiff to sustain a greater burden of proof. Liability for foreseeable harm will be imposed upon proof that the particular animal possessed a propensity that caused the plaintiff’s injury, and that the defendant had actual or constructive knowledge of that propensity. This knowledge is termed scienter. We hold, and find, that the theory of strict liability does not apply to the facts in this claim.
Section 518 of the Restatement of Torts 2d provides: “Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability to harm done by the animal if, but only if, (a) he intentionally causes the animal to do the harm, or (b) he is negli: gent in failing to prevent the harm.”
This claimant must establish the classic negligence cast i.e., (1) that the defendant owed a duty to him, (2) the this duty was negligently breached, (3) that he sufferd damages proximately caused by the defendant’s breach d duty, and (4) that he was not contributorily negligent.
An owner and keeper of a domestic animal b obligated to adhere to a standard of care based on common experience and general knowledge. Thus, the owner of an animal is charged with knowledge of the ordinary propensities of the species or breed and of any particular propensities of the specific animal, and he must observe the standard of care that a reasonably prudent man with similar knowledge would observe.
An animal may not, strictly speaking, be vicious and yet may have such proclivities as to make it dangerous. It is the opinion of this court that this record establishes that heifers of the age and size of the animal involved in this incident are commonly known to be frisky, excitable, *335 and prone to rear or jump. The employees of the Attica Correctional Facility charged with the supervision and operation of the dairy barn in which this claimant was injured, were long time farmers and employees, and experienced with the care and handling of dairy animals. This incident was clearly foreseeable, and it is our conclusion that this claimant was owed a duty by the defendant to properly restrain the animals, and to be given instructions and training in the proper method of handling these animals, and conducting himself while he was caring for them. This claimant categorically states that he was not given the benefit of such instruction or training, and none of the State’s witnesses testified to the contrary. We find and hold that these were acts of negligence which are chargeable to the State, they are the proximate producing cause of the accident and claimant’s injury, and we find further that this claimant in no way contributed to the incident. The State must respond in damages. (Cassidy v State of New York, 5 Misc 2d 835; Gaccione v State of New York, 173 Misc 367.)
The claimant has a life expectancy of 17.5 years. We conclude that Robert C. Giles suffered the injuries described by him and his physician, resulting in some of the permanency to which he testified, and he is awarded the sum of $50,000 for said injuries, the permanency resulting therefrom, and the pain and suffering which he endured, or may in the future experience.
The court awards the claimant the sum of $52,360, as and for all damages.
All motions made on the trial by the State to dismiss this claim are denied. All motions made and upon which the court reserved decision are also now deemed denied.