**Armand F. F. LEGARE, as Administrator of the Estate of Violet Alida Legare, deceased, and as surviving spouse of Violet Alida Legare, deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 4413–Civ.–J.**

United States District Court
S. D. Florida,
Jacksonville Division.
Feb. 15, 1961.

**558**

Nichols, Gaither, Beckham, Colson & Spence, Miami, Fla., for plaintiff.

E. Coleman Madsen, U. S. Atty., John L. Briggs, Asst. U. S. Atty., Jacksonville, Fla., for defendant.

SIMPSON, Chief Judge.

█ This action is brought under the Federal Tort Claims Act, §§ 2671–2680, Title 28 U.S.Code. This Court has jurisdiction under § 1346(b), Title 28 U.S. Code. Plaintiff asserts two distinct causes of action arising from the death of Mrs. Violet Alida Legare on April 6, 1959. The first cause of action is that of Armand F. F. Legare, individually, as surviving spouse of the decedent for damages for her wrongful death under Florida Statutes 768.01, F.S.A. and 768.02. The second claim is brought by Mr. Legare as administrator of the decedent's estate to recover under the Florida Survival of Action Statute, § 45.11 F.S.A. for his decedent's conscious pain and suffering as damages accruing to her and surviving to the personal representative under the Florida Statute, between the date of injury, March 17, 1959, and the date of death, April 6, 1959.

The case was tried before the Court, without a jury, and submitted by counsel for the respective parties on all issues of fact and law. Thereupon the Court makes the following

### Findings of Fact

1. Jurisdiction is present, under the applicable statutes, noted above.

█ When the case was called for trial on the date it was set, October 6, 1960, with the parties, their counsel and their witnesses present for trial pursuant to notice, Government counsel suggested lack of jurisdiction or improper venue under Rules 3 and 7 of the Local District Rules. The original injury occurred in.

Key West Naval Hospital, Monroe County, Florida, in this District but in another Division (created by Local Rule 3, not by statute), and death occurred at Walter Reed Hospital, Washington, D. C. Jurisdiction is clearly present. The venue question was not timely raised, assuming it to be valid, and no prejudice to the rights of the Government in going to trial was suggested. The objection was overruled as being without substance.

2. At the opening of the trial, counsel for the Government admitted the liability of the defendant under the Tort Claims Act, and made specific admissions of record to pertinent paragraphs of the complaint with the exception of the allegations of damages. The case was tried on the issue of damages only, with the following matters admitted without further proof:

■ That on or about March 17, 1959, the plaintiff's decedent underwent pelvic surgery at the U. S. Naval Hospital in Key West, Florida, and that such surgery was performed by agents, servants and employees of the United States, that is United States Navy doctors, acting within the course and scope of their agency, service and employment; that before, after, or in the course of said operation, blood was introduced into the body of the decedent by the Navy doctors, of a type and RH factor which constituted a major mismatching of her blood. (In this connection it was admitted only that if the Navy doctors were called to testify it would be their medical opinion that there was a major mismatching of blood, and that there would be no other testimony on the point so that the Court is required to find for the plaintiff as to this factual issue) ; that the mismatching of blood was due to the negligence of employees of the United States; that as a direct and proximate result of the major mismatched blood transfusion, the decedent's physical condition rapidly deteriorated and she was moved to Walter Reed Hospital, Washington, D. C., where she died April 6, 1959, as a proximate result of the said carelessness and negli-

gence of the defendant's employees, acting in the course and scope of their duties. It was also stipulated that Mr. Legare is the duly qualified and acting Administrator of his wife's Estate.

3. Except for cross-examination of the witnesses for the plaintiff, the defendant introduced no evidence. The following findings deal with the questioned issues of damages upon the two separate claims under the applicable Florida Statutes, the action of the surviving spouse of Mrs. Legare under §§ 768.01 and 768.02 F.S.A., and the Administrator's action under § 45.11 F.S.A.

### Damages to Mr. Legare as Surviving Spouse

4. Mr. Legare is a career officer in the Submarine Service of the United States Navy. His present rank is Lt. Commander, and his present assignment is Commanding Officer of the USS Bicuna, a Guppy 1–A, Snorkel Submarine. He was given that command in September, 1959. The trial date was especially arranged to meet his shore time between cruises. He had then just returned from a cruise in undisclosed waters, of 58 days, during which time no "liberty ports" were entered, and during 39 days of which time the ship remained submerged, "snorkeling."

He entered the Navy as an enlisted man January 2, 1941, two days after his 17th birthday, and was picked from the ranks to attend Annapolis by a Navy Selection Board, as a result of rigorous competitive examinations. He was engaged in extensive action under fire in the Pacific aboard a heavy gun cruiser in late 1941, and until September, 1942, when he entered the U. S. Naval Academy as a Midshipman. He graduated in June 1945, and was commissioned as Ensign. A month later he married his childhood sweetheart, Violet Alida, in his home town of Haverhill, Massachusetts.

5. Mr. Legare's entire service as an officer has been spent in submarines. Members of that service are selected, from volunteers, and may be said to con-

stitute an elite, dedicated and carefully chosen branch of the Navy. The importance of this service in the defense and retaliatory plans of this nation is a matter of general knowledge and requires no comment. Performance of his duties by Mr. Legare entails long absences at sea, when he is completely out of touch with his family and their welfare, at a time when his responsibilities are most demanding.

An official Navy publication (Pl.Ex. No. 2) says:

> "The family of the naval officer is a vitally important part of the Navy team. Far more so than in civilian life, the Navy wife has the opportunity to further her husband's career. Her patience and understanding, her acceptance of additional family responsibility contribute immeasurably to his peace of mind. Considering the responsibilities of an officer in the world's foremost Navy, it is readily apparent that his peace of mind is essential to the best performance of his duty. It is no wonder then that the welfare of his wife and family, leading to a happy home life, play such a major role toward the success of the Navy."

This official view deals with U. S. Naval officers and their families generally, and takes on added emphasis when applied to an officer of the Submarine Service.

6. The evidence of those who knew her, unnecessary to recapitulate in detail, demonstrates that Mrs. Violet Alida Legare fully met her responsibilities as a wife and mother. She was an excellent Navy wife, in all that that term expresses and implies. She was her husband's partner, playmate and helpmate, and a devoted and conscientious mother. The children's care, their education, their social and religious training received her constant loving attention and understanding.

7. This couple had six children, two girls and four boys, including Michael, the youngest, born by Caesarian section March 17, 1959, on the occasion of his mother's receiving the fatal mismatching of blood. The names and ages (at the time of the mother's death) of the others are: Joan, 12, Charles, 10, Armand, 8, Marie, 3, and Felix, 2. Since their mother's death the three older children have made their home with Mr. Legare's brother, Phillip, a retired naval officer, and his wife, at Salem, New Hampshire. The three younger ones are being cared for in the home of Mr. Legare's sister, Blanche, and her husband (a double amputee, from wounds received in the Battle of the Bulge), at Haverhill, Massachusetts. The two places are eight or ten miles apart, and the children visit with each other often. For care of his children, Mr. Legare pays his sister $200 monthly, and his sister-in-law the same amount. This is based, not on value of the services, but upon his present ability to pay, from present total pay and allowances of $937.00 monthly. Both ladies are in their fifties, and while willing to help in the present emergency, are unwilling (and for obvious reasons, probably unable) to make these arrangements permanent. Additionally, as he has an eminent right and duty to say, the plaintiff father testifies: " * * * they are my kids and I want them home with me." (R. p. 49). "Q. You want them to live with each other; is that right? A. Yes sir." (R. p. 49). "Well, these are my children. I want to raise them." (R. p. 49). Fair recompense for the loss of his wife's services should be computed to make these purposes possible of achievement.

8. From the testimony of Dr. Albaugh, Miss Olga Pratt, and Dr. Lassiter, I conclude that the expense to the father of providing the children a home, the services of a suitable person to run the home and minister to the children's needs, and the services of domestic help can be met by providing the plaintiff $8,500 per year for 18 years. (In 18 years the youngest child, Michael, will be of college age.) The present value of an annuity of $8,500 per year for 18 years,

compounded at 4% is $98,838.[1] Plaintiff makes a strong argument, based upon Dr. Lassiter's testimony, for balancing the inflationary trend, which has continued uninterruptedly now for a number of years, against the discount for reduction to present money value, and awarding the full total of the yearly needs, without application of the reducing factor. Dr. Lassiter is persuasive that costs of domestic help, and of college trained school teachers (for use as governess), will continue to rise, and at a greater rate, averaged out, than the 4% discount factor. There is no contrary testimony before me. But this recovery is under the Florida Death by Wrongful Act Statute, and I must follow, not lead, the Florida courts. If the Florida Supreme Court has ever decided that annuity type damages, in death cases, or even in reduction of earning capacity cases, should not be reduced to present money value because of probable inflationary trends, I am not aware of such a holding.

■ 9. Finding 8 (above) takes care of the elements of damage caused by the loss of the wife's services. Remaining for assessment is a proper award for the loss of the companionship and consortium of the wife during the couple's joint life expectancy. This is, of necessity, almost arbitrarily arrived at. Such matters are, it seems to me, better committed to the enlightened conscience, exercised jointly, of twelve jurors, rather than to a single trier of fact, whether the one present here, or another. Who can value the love and companionship, the strength and solace in times of sorrow, the joyous partnership in times of happiness, of a steadfast and devoted wife? The evidence here is compelling that Mr. Legare had such a marriage for fourteen years, that he has lost such a wife. Her price is "far above rubies," (Proverbs 31:10), and no figure in dollars can be set down as adequate compensation. Because this is so, but because this element of damage nevertheless must be recognized, this item of recovery is fixed at $25,000, admittedly an arbitrary figure, but nevertheless amply supported by the evidence.

■ 10. The plaintiff is also entitled to recover funeral expenses, stipulated to be $1,200.

■ 11. These three items of damage total $125,038, rounded off to $125,-100, which will be awarded as damages upon the claim of Mr. Legare as surviving spouse.

### The Administrator's Claim

■ 12. Mrs. Legare lived twenty days, March 17 to April 6, after the introduction into her veins of the mismatched blood. Her condition was such that her Priest administered Extreme Unction before she left the operating room. She was unconscious during two or three days at Key West, and for the last few hours at Walter Reed. She was highly toxic and did not suffer extreme physical pain most of the time. But she was in constant and conscious discomfort and moderate pain nearly all the remaining time. She knew she was in extremis for a number of days. The gravity of her situation was a matter of conscious knowledge and she discussed it more than once. As a sensitive person and a devoted mother, the imminent prospect of leaving six motherless children was a matter of supreme concern and anguish to her. She faced this prospect during all her waking hours for about seventeen days. I consider an award on the Ad-

1. 4% is the discount figure used as presently and for the foreseeable future realizable from conservative investment. The computation is actually made for 18.09 years, the nearest figure to 18 years shown in the Life Expectancy Tables, Volume 27, Florida Statutes Annotated, page 352. It is the expectancy in years for age 54. The present value of $1.00 per year for age 54 is shown in the 4% Table, page 355 of the same volume, to be $11.628. This multiplied by $8500 gives the result of $98,838 used herein. With deference to the competence of Dr. Lassiter's rather more complicated computations, I prefer to use these Tables as the accustomed tools of my trade, and as such better understood and applied by me.

ministrator's claim for conscious pain and suffering of Mrs. Legare of $25,000.00 to be justified by the evidence, and this amount will be awarded in the judgment upon the Administrator's claim for the Estate.

### Conclusions of Law

1. The Court has jurisdiction of the cause, and of the parties, under the applicable Federal and Florida Statutes, noted in the introductory paragraph of these Findings and Conclusions.

2. The liability of the defendant is conceded and admitted, and the plaintiff, in his individual capacity, and in his representative capacity is entitled to recover judgment from the defendant upon the two claims asserted in his complaint.

3. Plaintiff, Armand F. F. Legare, individually, as surviving spouse of Mrs. Violet Alida Legare is entitled to judgment against the defendant in the amount of $125,100. See Lithgow v. Hamilton et al., Fla.1954, 69 So.2d 776, where the Supreme Court of Florida refused to disturb a jury award of $100,000.00 for the wrongful death of a wife and mother, based on evidence of the value of services substantially similar to that introduced by the plaintiff here.

4. Plaintiff, Armand F. F. Legare, as Administrator of the Estate of Violet Alida Legare, is entitled to judgment against the defendant in the amount of $25,000.

5. This case was prepared and filed by present counsel in the Miami Division of this Court, and thereafter dismissed. Plaintiff's counsel stated in open Court, without dispute by Government counsel, that this was done as an aid to settlement, but that settlement negotiations broke down. The case was re-filed in this Division and was tried here. Liability was admitted at the opening of trial, so that this issue was not tried. But liability had been the subject of extensive investigation and study, requiring a high degree of competence, in order to be established. The issue of resultant damages was skillfully and ably tried. Plaintiff's counsel is entitled to be award-ed, as reasonable attorneys' fee, the full 20% of the respective awards permissible under § 2678, Title 28 U.S.Code. This amounts to $25,020 out of, but not in addition to the award to Mr. Legare individually, and $5,000 out of, but not in addition to, the award to the Administrator.