193 So.2d 492 (1966)
Ruby WARD, As Administratrix of the Estate of Fred R. Ward, Deceased, Appellant,
v.
ORANGE MEMORIAL HOSPITAL ASSOCIATION, INC., a Non-Profit Florida Corporation, Appellee.
Ruby WARD, Widow, Appellant,
v.
ORANGE MEMORIAL HOSPITAL ASSOCIATION, INC., a Non-Profit Florida Corporation, Appellee.
Nos. 12, 13.
District Court of Appeal of Florida. Fourth District.
December 30, 1966.
Rehearing Denied January 20, 1967.
*493 Russell Troutman, of Fishback, Davis, Dominick & Troutman, Orlando, for appellant.
Roe H. Wilkins, of Maguire, Voorhis & Wells, Orlando, for appellee.
WALDEN, Judge.
This consolidated appeal is brought by plaintiff from orders granting a new trial upon the issues of damages.
Plaintiff's husband, Fred R. Ward, died as a result of being transfused with the wrong type blood while being given prostate surgery in defendant's hospital.
Plaintiff brought two negligence actions against defendant. They were consolidated for trial. One sought damages in her capacity as administratrix of her husband's estate under authority of F.S.A. § 45.11. It resulted in a verdict in the sum of $50,000.00. The other sought damages as the widow of decedent under authority of Chapter 768, F.S.A. It resulted in a verdict in the sum of $125,000.00.
The trial court considered the usual post-trial motions. The outcome of the liability issues was approved, but new trials were ordered upon the damage issues.
The appealed orders contained the general predicates which indicate that a jury verdict is about to be set aside. For instance, we note that the judicial conscience was shocked; that the jury was influenced by passion, prejudice, sympathy or other matters outside the evidence; that the verdicts were grossly excessive; that the jury did not understand the charge or, if they did, they disregarded it; and that horror prevented a fair and impartial consideration. Such opinions or premises must find a basis in the record, as otherwise an abuse of discretion is indicated. See Cobb v. Brew, Fla.App. 1963, 155 So.2d 814. See also Russo v. Clark, Fla. 1962, 147 So.2d 1; Mansell v. Eidge, Fla.App. 1965, 179 So.2d 624; Park v. Belford Trucking Co., Fla.App. 1964, 165 So.2d 819; Bell v. Tarvin, Fla.App. 1964, 163 So.2d 300; Bailey v. Sympson, Fla.App. 1963, 148 So.2d 729.
The appealed orders went further to mention certain specific improper acts and influences that formed the basis for the trial court's conclusions and which operated to spawn the grossly excessive verdicts. In fairness, we note the orders containing the specific findings were entered about 22 days following trial, with the trial court not having the benefit of a transcript of testimony in recalling the trial incidents. The summarized wrongs immediately followed by our assessments are as follows:

A. Plaintiff's counsel made a "Golden Rule" closing argument.

A Golden Rule argument may constitute reversible error. Its thrust is to ask the jury to put themselves in plaintiff's shoes in deciding the amount of damages. See Magid v. Mozo, Fla.App. 1961, 135 So.2d 772; *494 Bullock v. Branch, Fla.App. 1961, 130 So.2d 74. The argument in question was:
"Now, you heard Mr. Troutman's ideas about what Mrs. Ward's losses will be. She has been reasonable. I would hate to think my wife would think I was worth less, if my death were caused under these circumstances, so no one knows, gentlemen, and only you in your consideration of this case can resolve the question of what amount of money under the law will most reasonably compensate Mrs. Ward for her  for her losses."
Defendant did not object to it. We do not think it was improper or that it constituted a Golden Rule argument under the mentioned cases or any other authority of which we are aware.

B. Dorothy Blake, a nurse in defendant's hospital, testified so as to introduce the matter of the hospital's insurance coverage into the trial.

The record does not disclose that Dorothy Blake ever made any reference, directly or indirectly, to insurance. Possibly, it was intended to refer to the testimony of Roberta Briggs, the nurse in charge of the blood bank laboratory. Defendant's counsel attempted to impeach her during the course of cross-examination. He sought to have her admit to a certain statement which obviously had been made to an insurance company investigator. The witness evinced difficulty recalling the particular occasion and events. Finally, defendant's counsel indicated the statement was taken by one Jack Snead and asked further:
"Q: Do you recall talking to him?
"A: No, sir. It was quite a long time ago.
"Q: You don't remember?
"A: I don't remember the name.
"Q: You remember somebody talking to you?
"A: I remember talking to an insurance person. Now, I can't tell you his name."
No objection was made to this mention and this was the only reference to insurance in the record that we could find. It was elicited as the clearly foreseeable response to defendant's question, with plaintiff being in nowise responsible. In sequence, we do not think the mention was harmful. If it was, it should have been brought to the court's attention for easy instruction cure. Finally, in the posture of things, even assuming it to be harmful, we do not see how it can be treated as inuring to defendant's benefit inasmuch as the mention was the sure fruit of defendant's interrogation.

C. The majority of decedent's pain and suffering was caused by the operation and not the faulty blood transfusion.

There is no support for this conclusion in the record. The record reveals abundant substantial competent evidence to the contrary. The period from transfusion to death was 17 days. For instance, one medical expert said that pain from the prostate operation would only exist for a period of 24 to 48 hours following surgery. Another said that everything done for decedent during the period was directly related to the blood mismatch.

D. The horror of talking about blood and mismatching during a four day trial prevented the jury from being fair and impartial.

We must confess that we do not know how a trial such as this could be conducted without a goodly amount of testimony about blood and the effect of a mismatch of same upon the human body and we would wonder how the situation might be remedied on re-trial. We assume that the court correctly ruled as to relevance and materiality, in receiving the testimony and exhibits and we would assume further that upon a new trial the same testimony *495 and exhibits would be proffered with the same result. Thus, we do not believe that this item is a worthy basis for ordering a new trial, particularly since we are unable to discover any improper or undue emphasis as to these features.
The four points just listed lend themselves to exact survey. Finding no merit in them, we now look to the record in gross to see if we can discover any sufficient basis for the court's cancellation of the damage awards and the court's announced opinion as to the excessiveness, shocked conscience and prejudice.
Decedent entered defendant's hospital for routine prostate surgery. He was in good health with a table life expectancy of 14-plus years at trial  16 years from time of death. Plaintiff, his wife, had a longer expectancy. He was not apprehensive or in distress and expected to be discharged in 4 or 5 days. During surgery a tragic mistake happened with two pints of Type A, instead of Type O, blood being used in a transfusion. The almost inevitable aftermath of kidney failure and uremic poisoning took place. It would serve little purpose to detail the massive and varied program of constant treatment inaugurated during the course of the seventeen days that elapsed between the mismatched blood transfusion and decedent's death. Decedent was visited continuously with severe pain, suffering and apprehension, he being conscious almost to the moment of his death.
In sum, with reference to the administratrix' action and verdict rendered therein for $50,000.00 for decedent's pain and suffering, we find no basis whatever to support the court's action in ordering a re-trial of damages. This issue was properly submitted to the jury and their return indicates no violation of instructions or excess. We do not deem the award made excessive in the light of the testimony adduced. Neither is it excessive compared to awards made in other cases. Of course, comparisons of the injuries suffered and the awards granted in other cases cannot be made with wholly satisfactory results. However, the case of Florida East Coast Railway Company v. Stewart, Fla.App. 1962, 140 So.2d 880, awarded $100,000.00 for 6 days of extreme pain and suffering. A Federal District Court case, Legare v. United States, D.C.S.D.Fla. 1961, 195 F. Supp. 557, applying Florida Statutes for the wrongful death of a woman who, too, had died because of a major mismatch of blood and lived for 20 days, 17 of them while she was conscious, awarded $25,000.00 to her administrator for her "moderate" pain and suffering. The court, in justifying the award, said:
"* * * She was highly toxic and did not suffer extreme physical pain most of the time. But she was in constant and conscious discomfort and moderate pain nearly all the remaining time. She knew she was in extremis for a number of days. * * *" 195 F. Supp. at 561.
We have the same reaction as just cited with reference to the widow's action. But there is one additional factor. Here, the court indicated "the pecuniary loss for loss of support and dower when reduced to its present value would be no greater than $25,000.00 and an award of $100,000.00 for loss of companionship for this lady in connection with the marriage has no reason or justification".
There are additional factors, as mentioned in the court's charge, which the jury could consider in addition to that listed by the trial court in the appealed order. For example, there are the factors of her loss of services, their marital relationship and their station in society, each of which would support an award in addition to the loss of companionship. Thus, if we assume the accuracy of the table as to decedent's life expectancy, using a fourteen-year period from date of trial, we see that the annual recovery for the mentioned items is $7,142.00 a year, or something over $590.00 per month. The *496 record reveals that the relationship between the husband and wife was extraordinarily close, affectionate and dependent. While the jury award may be more than these reviewers or the trial court would award had we been the jury, it may not be said that the sum exceeds allowable limits or is not supported by the evidence.
The performance of our appellate duty causes us to reverse the orders appealed and to direct the re-establishment of jury verdicts because of our conviction that there was error and abuse of discretion reflected by the entry of the orders requiring new trials as to damages. See Mansell v. Eidge, Fla.App. 1965, 179 So.2d 624; Bell v. Tarvin, Fla.App. 1964, 163 So.2d 300; Cobb v. Brew, Fla.App. 1963, 155 So.2d 814; Bailey v. Sympson, Fla.App. 1963, 148 So.2d 729. See also Russo v. Clark, Fla. 1962, 147 So.2d 1.
Reversed.
ANDREWS, J., concurs.
SMITH, C.J., dissents.
SMITH, Chief Judge (dissenting).
I must dissent. My opinion of the manner and scope of appellate review of an order granting a new trial is set forth extensively as a preface to my review of the evidence in order that the latter may be better understood.
In the very early case of Schultz v. Pacific Insurance Co., 1872, 14 Fla. 73, the supreme court, after there noting that the verdict of the jury was founded on complicated and contradictory evidence which required an investigation into the character and credibility of the witnesses in order to compare and weigh the evidence and that this is the proper function of a jury, then continued by stating:
"While it is true that this is the proper function and province of the jury, it is at the same time true that in cases where there is conflict in the testimony, it is within the province and power of the court to set aside a verdict which does not reach a substantially just conclusion in cases where the conflicts are of such character and the circumstances of such nature as to give just grounds for the belief that the jury acted through prejudice, passion, mistake or any other cause which should not properly control them. This power exists in the court. In exercising it the court does not encroach upon the province of the jury, for the reason that it does not conclusively settle facts in the form of a verdict, but only gives another jury the opportunity of so doing, and of correcting what appears to be a mistake. If this is not properly within the power of the court, then the result is that the first twelve men that happen to constitute a jury in a given case are by law the final arbiters of the facts in that case. There is no such principle of law."
In the same vein it has also been stated that when a court sets aside a verdict as excessive it does not usurp the prerogative of the jury because that power is one of the historic safeguards of the right to trial by jury. Bartholf v. Baker, Fla. 1954, 71 So.2d 480. The same general principles of law have been carried forward but stated a little bit differently in innumerable decisions culminating in Cloud v. Fallis, Fla. 1959, 110 So.2d 669. As noted by Judge Allen in Grant v. Williams, Fla.App. 1966, 190 So.2d 23, although it was apparently the intention of the court to settle the matter of review of orders granting new trials in Cloud v. Fallis, nevertheless, the courts seem to be again getting in the same condition which existed prior to Cloud v. Fallis, that is, some of the decisions are based upon the substantial evidence rule, some on the broad discretion rule, while others seem to commingle the two rules. Judge Allen notes, and I concur in the thought, that Cloud v. Fallis distinguishes between the two rules but then provides for use of the broad discretion rule in reviewing orders granting new trials. As stated in Cloud v. *497 Fallis: "When the judge * * * concludes that the verdict is against the manifest weight of the evidence, it is his duty to grant a new trial, and he should always do that if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record * * *. Inasmuch as such motions are granted in the exercise of a sound, broad discretion the ruling should not be disturbed in the absence of a clear showing that it has been abused. * * * The burden to make error clearly appear is on the appellant. * * *" The opinion then notes that a finding on the part of the appellate court that there is some "substantial competent evidence" in the record to support the verdict is not enough to warrant reversing the order granting a motion for a new trial. The opinion then continues by stating that there must be a "clear showing of an abuse of * * * discretion", that "a stronger showing is required to upset an order granting than an order denying a motion for new trial", and it is the duty of the trial court to grant a motion when the verdict fails "to comport with the manifest weight of the evidence". Finally, the opinion notes that the trial judge is in a much better position to pass upon the ultimate correctness of the verdict. More or less this same resume is set forth in Danek v. Hoffman, Fla.App. 1966, 189 So.2d 893, in an opinion by Judge Shannon in which he tracks various decisions since Cloud v. Fallis, reaffirms the broad discretion rule, and notes that in that cause under review the record yielded totally inconsistent conclusions and that the trial court said that the verdict was contrary to the great weight of the evidence. He then concluded that the test on review is not whether the appellate court agrees with the evidentiary conclusions of the trial court or whether the jury verdict finds support in the record but whether there is sufficient evidence to support the evidentiary finding made in the order granting a new trial. The court then found that, while there was evidence in the record in accord with the jury verdict, the evidence was not so preponderating as to render the judge's order overturning the verdict an abuse of discretion.
In the consolidated trial of the two causes of action the jury returned a verdict of $50,000 for the administratrix, all for decedent's conscious pain and suffering, and $125,000 in the widow's survivor's action for her loss of the marital relationship, the loss of her husband's services, her loss of support from her husband, the loss of her husband's station in life and her loss of expectancy in the way of dower and inheritance. There were no proofs of fixed sum damages such as medical, hospital or funeral expenses.
In the order granting the motion for a new trial in the widow's survivor action the court noted that it "heard personally all the evidence and having observed the demeanor of the witnesses, particularly that of the Plaintiff, Ruby Ward * * *" and then concluded that a new trial should be granted because the verdict was grossly excessive. The order then continued:
"The Court has carefully and fully considered the size of the verdict in relation to the evidence presented at the trial and as above stated has observed the witnesses and all the evidence presented. The amount of the verdict of $125,000.00 is so grossly excessive that it shocked the judicial conscience of the Court. It indicated to the Court that the jury was influenced by passion, prejudice, sympathy or other matters outside of the evidence. In reflecting on the case, some of the factors that must have influenced the jury but by no means limited their influence are the following:
"a. Mr. Davis, representing the plaintiff in his closing argument made reference to the fact that he hoped that he would be worth $300,000.00 to his widow, if for some reason he was killed. This is closely akin to the `Golden Rule' argument and in my opinion improper. There was no objection to this statement by counsel but nevertheless in my opinion *498 it must have greatly influenced the jury and each of the jurors considered what he personally would be worth rather than objectively viewing the damages to the plaintiff.
"b. The question of the hospital having insurance crept into the trial in connection with the testimony of Dorothy Blake, a nurse employed by Orange Memorial Hospital Association, Inc. There were several references made to the statement that she had given a representative from the hospital a written statement and that representative was identified as the insurance investigator. Comment was made on this by counsel for the Blood Bank.
"c. This trial lasted 4 days all of which was concentrated in talking about blood and mis-matching of blood. I cannot help but feel that horror of what may happen to an innocent victim crept into the jury's verdict rather than a fair and impartial consideration of the evidence.
"In short, the sum of $125,000.00 for a widow of a man age 61 at the time of his death, whose earnings were but $2,500.00 per year or at most an average of $3,000.00 a year, is not justified and has no basis in the record to authorize such a verdict. The pecuniary loss for loss of support and dower when reduced to its present value would be no greater than $25,000.00 and an award of $100,000.00 for loss of companionship for this lady in connection with the marriage has no reason or justification.
"The Court states that its conscience was shocked immediately upon receiving the verdict and no authorities or arguments presented has lessened that feeling in any respect."
In the order granting a motion for the new trial in the action of the administratrix the court again noted that it heard personally all of the evidence and observed the demeanor of the witnesses, particularly that of the plaintiff, Ruby Ward, and granted a new trial because the verdict was grossly excessive. In that order the court then stated:
"The Court has carefully and fully considered the size of the verdict in relation to the evidence presented at the trial and as above stated has observed the witnesses and all the evidence presented. The amount of the verdict of $50,000.00 is so grossly excessive that it shocked the judicial conscience of the Court. It indicated to this Court that the jury was influenced by passion, prejudice, sympathy or other matters outside of the evidence. In reflecting on the case, some of the factors that must have influenced the jury but by no means limited their influence are the following:
"a. The question of the hospital having insurance crept into the trial in connection with the testimony of Dorothy Blake, a nurse employed by Orange Memorial Hospital Association, Inc. There were several references made to the statement that she had given a representative from the hospital a written statement and that representative was identified as the insurance investigator. Comment was made on this by counsel for the Blood Bank.
"b. This trial lasted 4 days all of which was concentrated in talking about blood and mis-matching of blood. I cannot help but feel that horror of what may happen to an innocent victim crept into the jury's verdict rather than a fair and impartial consideration of the evidence. I do not feel that the jury understood the Court's charges on damages for pain and suffering of the deceased, if they did, they disregarded it, in the Court's opinion. The verdict reflected more potential horror than enlightened conscience of the jurors.
"In short, the sum of $50,000.00 for 17 days of pain and suffering the majority of which was caused by an operation and not the faulty blood transfusion has no *499 predicate whatsoever in the record of this case.
"The Court states that its conscience was shocked immediately upon receiving the verdict and no authorities or arguments presented has lessened that feeling in any respect."
Verdicts totalling $175,000.00 for the death of a man are not per se grossly excessive. This record discloses that plaintiff's decedent was said to be, and the case was tried on the assumption that he was, sixty-one years of age at the time of his death. His wife was younger and had a longer life expectancy. He married the plaintiff about twelve years prior to his death. They had no children. He was an engraver by trade but in the latter part of his life he also worked as a diamond setter. His income decreased from $4,391.88 per year in the third year prior to his death to $2,284.56 for the last full year of his life. A part of the evidence presents a picture of the decedent as a kind, loving and affectionate husband having a close relationship with his wife, always extending particular consideration for the comfort and welfare of his wife. He worked six days a week. The other part of the picture is quite different. There it is shown that he was born in 1890, yet he gave his age as sixty-one at the time of his death. He closed out his business prior to the Christmas preceding his death but did not tell his wife that he had done this. He told his wife that he was going to make a trip to New York during that holiday season. Instead of going there he wandered about the State of Florida; his wife was worried about him and called a friend in her efforts to locate him. In the course of that absence he visited a psychiatrist in another city who described him as a very peculiar, eccentric individual, nervous and concerned about his business difficulties. The psychiatrist concluded that he showed early signs of schizophrenic process or a mental illness. He told another witness that he was afraid to return to his home, that he had trouble at home, that his wife had a gun and he was afraid she might use it. He never told his wife anything about his life prior to their marriage.
The decedent's conscious pain and suffering during the seventeen days that elapsed between the tragic mismatched blood transfusion and his death also involves two different pictures, not in themselves contradictory as to any specific facts but rather different opinions of his pain and suffering given by different witnesses. The differences range from continuous pain and suffering because of the effects of the transfusion to typical pain and suffering following major surgery which would have normally occurred without the complications of a mismatched blood transfusion.
I concede that there is substantial competent evidence in the record to support the verdict but in my opinion this is not enough to warrant reversing the order granting a new trial. The record does not demonstrate to me a clear showing of an abuse of discretion. To the contrary, I find much evidence to support the stated grounds for a new trial.
I would affirm.