295 So.2d 634 (1974)
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 675, Appellant,
v.
Earl Lowell Lassitter, Appellee.
INTERNATIONAL UNION OF OPERATING ENGINEERS, Appellant,
v.
Earl Lowell LASSITTER, Appellee.
Dennis WALTON, Appellant,
v.
Earl Lowell LASSITTER, Appellee.
Nos. 72-566  72-568.
District Court of Appeal of Florida, Fourth District.
April 26, 1974.
Rehearings Denied June 21, 1974.
*635 Thomas J. Pilacek, of Mamber, Gopman, Epstein & Foosaner, North Miami Beach, for appellant International Union of Operating Engineers, Local No. 675.
Larry Klein, of Cone, Wagner, Nugent, Johnson & McKeown, West Palm Beach, and Woll & Mayer, Washington, D.C., for appellant International Union of Operating Engineers.
J. Leonard Fleet, Hollywood, for appellant, Dennis Walton.
Rex Conrad and Ronald A. Fitzgerald, of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellee.
WALDEN, Judge.
These are consolidated appeals in a labor union violence case. It results from disputes concerning jurisdiction over jobs.
Dennis Walton struck Earl Lowell Lassitter with his fists.[1] Lassitter suffered personal injuries as a result.
*636 Walton was a member of International Union of Operating Engineers and International Union of Operating Engineers, Local No. 675. Lassitter was not a member of the defendant unions. It was charged that Walton was an agent of his Local and the Local was an agent of the International Union.
Lassitter sued Walton and Walton's two unions for damages. The jury trial resulted in these judgments against the defendants totaling $1,250,000:

 Compensatory Damages
 Walton |
 Local No. 675 > Jointly and severally $ 240,000
 International Union |
 Punitive Damages
 Walton $ 10,000
 Local No. 675 300,000
 International Union 700,000

All defendants appeal. While the points are several, they group generally as a challenge to liability (except as to Walton) and damages.
We affirm the judgments as to liability  reverse them as to damages  and remand for a new trial as to all defendants upon the issue of damages, compensatory and punitive.

LIABILITY

THE LOCAL UNION:
Lassitter charged the Local with responsibility, 1) directly, claiming the Local ordered the assault, and 2) indirectly, claiming the Local responsible under respondeat superior for the acts of Walton. The record contains adequate evidence from which the jury could infer that the union had ordered the assault, such as:
1. The President of the Local wrote down Lassitter's name upon learning of Lassitter's intent to thwart the wishes of the union,
2. Walton admitted beating plaintiff because of an "agreement"[2] that plaintiff would not work on the job site,
3. A union member who witnessed the event was requested by the President of the Local not to testify.
And it is reasonable that the jury would find the union liable under respondeat superior when the following evidence was given that Walton was, indeed, the Local's steward and thereby its agent:
(1) Walton checked the union membership books of workers on the site, (a steward's duty),

*637 (2) Walton cleared in men and equipment when a new contractor came on the job,
(3) Walton directed a witness to contribute to the Local's blood bank,
(4) Walton ordered members of another union off equipment claimed by the Local,
(5) There was evidence that Walton had an agreement of some sort that Lassitter would not work on the job, and prior violent methods of the Local were evidenced in that
(6) A union meeting of stewards had been held in which the "tearing up" of "guys in Hallandale" who were doing "the union's" work was discussed and weapons distributed.
(7) Two witnesses, each a member of the Local, identified him as a steward, as did a foreman for another contractor on the job, and
(8) A member of the Local testified that when asking for the Union Steward he was directed to Walton.
We are satisfied under authority of Thee v. Manor Pines Convalescent Center, 235 So.2d 64 (4th D.C.A.Fla. 1970) that plaintiff made an adequate case to present to the jury because an agency relationship was prima facie established by the proofs. See also Forster v. Red Top Sedan Service, Inc., 257 So.2d 95 (3d D.C.A. Fla. 1972); Watkins v. Sims, 81 Fla. 730, 88 So. 764 (Fla. 1921). Cf. Reina v. Metropolitan Dade County, 285 So.2d 648 (3rd D.C.A.Fla. 1973), where it was determined that the assault was clearly not in the performance of his master's duties.
Authority to support a finding of vicarious liability for tortious behavior is seen in Wackenhut Corporation v. Greene, 238 So.2d 431 (3rd D.C.A.Fla. 1970); Dye v. Reichard, 183 So.2d 863 (4th D.C.A.Fla. 1966) and Sands v. Ivy Liquors, Inc., 192 So.2d 775 (4th D.C.A.Fla. 1966). In Atlantic Coast Line R.R. Co. v. Burquest, 101 So.2d 828 (2d D.C.A.Fla. 1958) the court said:
"`... If the employee, being engaged about the business of the employer, adopts methods which he deems necessary, expedient or convenient, and the methods adopted prove hurtful to others, the employer may be held liable. The purpose of the employee's act, rather than the performance thereof, is said to be the important consideration... .'"
The jury was properly instructed as to liability by the trial court in accordance with Florida Standard Jury Instruction 3.3(b), and no objection or other request on the issue was made during the charge conference.
The Local argues several minute propositions in its appellate presentation. We deem them, other than as here discussed, to be without merit and without need for opinion exploration. Thus, there is no basis for disturbing the judgment as to the Local's liability.

THE INTERNATIONAL UNION:
It is accepted that for the International to be liable plaintiff must have proved that the Local Union was International's agent. There is sufficient evidence for a jury to conclude that the Local ordered, or approved, the assault and that the assault was within the scope of Walton's duty. See, M R & R Trucking Co. v. Griffin, 198 So.2d 879 (1st D.C.A.Fla. 1967). The question remains whether the International is liable for violence initiated by affiliated locals in jurisdictional disputes. The International appellate position is that its constitution "permits Local Unions to conduct their relations with employers, including the right to strike, boycott and take actions incidental thereto... ." It argues, therefore, that there was a complete absence of International's involvement. The International attempts *638 to analogize the local-international situation with corporate parent-subsidiary liabilities. The comparison is not reasonable as the corporate veil hardly could be said to cloak an international union whose directives and constitution govern a local.
The annotation at 36 A.L.R.3d 405 (1971) states at 411:
"If an international union is joined as a defendant in an action in which the unlawful conduct was allegedly committed by members of a local union, the union's constitution should be examined to determine the relationship of the organizations to each other."
Contra to International's position, the International constitution specifically provides for its complete domination over the Local. The International president may suspend or remove Local officers, and suspend or revoke Local charters. The constitution provides the International with power to prohibit Locals from taking any action with an employer unless authorized by the International.[3] In addition, the Local is referred to in the constitution as a "subordinate sub-division" of the International. In International Brotherhood of Teamsters v. United States, 275 F.2d 610 (4th Cir.1960) the court found that provisions similar to these evidenced such control "as to warrant the conclusion that the local ... [was] ... a component of the International."
The case of United Brotherhood of Carpenters and Joiners v. Humphreys, 203 Va. 781, 127 S.E.2d 98 (1962), cert. den. 371 U.S. 954, 83 S.Ct. 509, 9 L.Ed.2d 501 (1963), held on similar facts that all defendants (including the International) were liable. The Virginia case of United Brotherhood referred to an earlier decision by that court which was affirmed by the U.S. Supreme Court; the United Brotherhood court interpreted their decision in United Const. Workers v. Laburnum Const. Corp., 194 Va. 872, 75 S.E.2d 694 (1953), aff'd 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), to say,
"[T]hat the very nature of the organization of the International Union was sufficient to show that the district organization was an arm of the international, and an agency relationship existed between the two bodies." 127 S.E.2d at 102.
This United Construction case post-dates the case of United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), upon which International relies. Further, the Coronado case may be distinguished because it is the evidence of agency upon which the jury may rely, and in Coronado evidence of such agency was found lacking. The union constitutional provisions mentioned above, when examined, can provide the evidence from which a jury might properly infer an agency relationship. An agent of the International regularly reported on jurisdictional disputes and Local activities. It is evident from the Virginia case of United Const. Workers, that upon evidence of pervasive constitutional control the International union may have an agency relationship with the Local, and that this jury was justified in finding that relationship. We believe that this discussion covers the central appellate assertion as to its liability.
We go now to the second major phase of this appeal, damages.

*639 DAMAGES
Were the damage awards excessive? We are obliged under the facts of this case and upon our consideration of the advice of counsel to answer in the affirmative. It is our firm judgment that the awards singly and in combination are so manifestly excessive as to shock our judicial conscience. Under the circumstances the verdicts could only be indicative of the improper influences of passion and prejudice working on the jury. These influences probably emanated from usual well known union partisanships, excited by injuries to an innocent victim, coupled with the publicity[4] and heated climate[5] under which the case was tried. See Generally 9A Fla. Jur. Damages §§ 98 and 99 (1972).
While not controlling, it is of interest in the consideration of the correctness of the damage awards to note and compare the values which Lassitter's own counsel assigned to the case in closing argument with the amount of the awards:

Compensatory Damages:
 Lassitter's counsel argued and urged: Jury awarded:
 $ 40,700 $240,000
Punitive Damages:
 With reference to International:
 Lassitter's counsel argued: Jury awarded:
 $300,000 $700,000
 With reference to the Local:
 Lassitter's counsel argued: Jury awarded:
 $100,000 $300,000
 With reference to Walton:
 Lassitter's counsel did not argue Jury awarded:
 an amount as to Walton. $ 10,000

Lassitter's counsel very thoroughly and extensively, as concerns the claim for compensatory damages, itemized all of the allowable categories of damages, and coupled it to the usual per diem argument to project the total sum which he deemed warranted and expedient to mention to the jury. However, as reflected above, the jury award of compensatory damages was more than five times larger than counsel's estimate. And as shown in the record, more than eighty-eight times larger than Lassitter's claimed special damages. With reference to punitive damages this matter was thoroughly urged to the jury one way and the other with the above reflected results. The award against the Local was three times that suggested and the award against International was more than twice the amount urged.
As we say again, we do not think counsel's argument is controlling and neither do we suggest that a jury may never return a larger sum. However we do think that the gross disparity here displayed in each category can mean only that the jury operated on the basis of passion and prejudice or other improper influence quite apart from the proper adjudication of damages based upon the facts and law as was instructed to them by the trial court.
Because of the fine and long standing reputation and expertise of Lassitter's counsel, confirmed by review of the record here, we can in nowise attribute the chasm existing between the argument figures and the verdicts to any undue timidity or professional misstep in the presentation of Lassitter's case.

COMPENSATORY DAMAGES

The injuries:
Lassitter suffered temporary injuries consisting of a severe hematoma, swollen eye, sprained jaw and neck, assorted cuts, and bruises about the head and elbow. His permanent injury was a partial loss of hearing in one ear, which is fully correctable *640 with the use of a hearing aid for the twenty-eight years of his life expectancy, and a small scar over one eye. Lassitter lost no time from work and hence had no loss of wages and neither was his earning capacity impaired in any manner. His past and future medical expenses, according to his own witnesses, totaled $2,700.
Reflective of the situation is that, following the assault, plaintiff reported to the emergency room of a nearby hospital where he was cleaned up and bandaged. Immediately after his treatment he returned to his place of employment and went to work. Two days thereafter he re-reported to the hospital to have his bandages replaced. He then reported to Dr. Burgess with complaints of a neck sprain as a consequence of which he received some physical therapy treatments. A Dr. Dasher did thereafter determine the partial loss of hearing and recommended the use of a hearing aid. Without in anywise minimizing or denigrating Lassitter's claim and his injuries, it is manifest to us that the award of $240,000 is far in legal excess of fair and just compensation which is the polestar of compensatory damages. We can find no way, however we view the evidence, to justify a sum in the area of $240,000. Loftin v. Wilson, 67 So.2d 185 (Fla. 1953).
Thus, we hold that the compensatory damage award against these defendants is without legal or factual support and same must be reversed for a new trial.

PUNITIVE DAMAGES
As a preliminary, it is our view that under the circumstances and facts of this case the trial court was warranted in instructing the jury on the question of punitive damages and indeed there was a proper basis for a verdict as to them. This is simply true because of the unprovoked assault and battery upon Lassitter and we make no further particular comment about this.
Our concern is with the amount of such damages awarded, that is to say, were the amounts of the verdicts supported and legally permissible? We think not.
We have been unable to determine any basis or hard and fast rule or formula in Florida as to the appellate approach to the proposition of excessive punitive damages. And we can only suppose that, depending upon the case and perhaps as a subjective standard, there must be some bridle, some yoke, some outer limit which can be determined at the appellate level. This is true even though full allegiance must be given to the function and nature of the task of the jury as enunciated in Richards Co. v. Harrison, 262 So.2d 258 (1st D.C.A.Fla. 1972); Threets v. Hardison, 255 So.2d 267 (Fla. 1971) and Ward v. Orange Memorial Hospital, 193 So.2d 492 (4th D.C.A.Fla. 1966). See also 9A Fla. Jur. Damages §§ 100 and 102.
First, it is our understanding that there should be some reasonable, albeit imprecise, relationship between punitive and compensatory damages. Air Line Employees Ass'n Int. v. Turner, 291 So.2d 670 (3d D.C.A.Fla. 1974); Crowell-Collier Pub. Co. v. Caldwell, 170 F.2d 941 (5th Cir.1948); Hutchinson v. Lott, 110 So.2d 442 (1st D.C.A.Fla. 1959). With this background we opine that there is an impermissible and gross imbalance here between the actual damages suffered and the punitive damages awarded.
Secondly, it is a basic tenet that the office of exemplary damages is to punish the defendants and serve as a deterrent to them and others. They stem from acts committed with malice, willfulness and reckless indifference. See 9A Fla.Jur. Damages § 136 (1972); Levine v. Knowles, 197 So.2d 329 (3d D.C.A.Fla. 1967). The punitive damages, therefore, should hurt, but they may not bankrupt. Joab, Inc. v. Thrall, 245 So.2d 291 (3d D.C.A.Fla. 1971). Thus, for a jury to discern *641 whether a defendant would be capable or incapable of paying a punitive award, or the desired degree of punishment or deterrence, it is necessary for there to be a relationship between these goals and the financial worth of a defendant. Richards Co. v. Harrison, 262 So.2d 258 (1st D.C.A. Fla. 1972); Hutchinson v. Lott, 110 So.2d 442 (1st D.C.A.Fla. 1959). In Hutchinson, supra, for example, the court found it necessary to take judicial notice of the salary of a policeman in order to determine the propriety of a punitive award. In Richards, supra, the court, at page 263, of 262 So.2d, held:
"In determining the amount of punitive or exemplary damages, the pecuniary circumstances of defendant . .. must be considered since an amount that would be pecuniary punishment to a man of small means would not necessarily serve as punishment to one of large means."
Thus, taking into account all considerations, the pecuniary worth of a defendant charged with possible punitive damages must be adduced as evidence before the jury. See Brock v. Maine, 293 So.2d 375 (4th D.C.A.Fla. 1974); Joab, Inc. v. Thrall, supra; Jacksonville Frosted Foods, Inc. v. Haigler, 224 So.2d 437 (1st D.C.A.Fla. 1969).
Was this done here? The evidence given of defendants' finances was as follows:

International Income of $600,000 per month
 from dues.
Local Income of $250,000 per year
 from dues.
Walton None.

There was no evidence of liabilities, expenses or net worth. There was simply no basis therefore for the jury to perform its duty and make an informed decision as to whether the awards were too much, too little, or just right in line with Florida Standard Jury Instruction No. 6.12.[6] Forasmuch as we or the jury could know the awards may have served to utterly bankrupt the defendants; on the other hand, they may have been, in balance, of such insignificance as to serve no punitive or exemplary purpose.
And now to put things together, we reiterate that it is necessary in support of the verdict awarding punitive damages for there to be adequate proofs of the defendants' net worth. We further reiterate that the proofs in this regard are altogether insufficient here.
We now come to the next step in our analysis. It is our view and specific holding that the burden of proving the net worth of the defendant in such cases is on the plaintiff who has plead the claim. While we have found no particular case so holding, we believe that this proposition is in general accord with the basic jurisprudence of this state. With the liberal and easy discovery procedures found in the Florida Rules of Civil Procedure[7] it would be a matter of small moment to cause the defendant to produce a current profit and loss statement and balance sheet or to call its treasurer or other competent person to testify as an adverse witness about such matters, so as to at least establish prima facie the defendants' net worth. It is our view that since the plaintiff has made the claim it is incumbent upon him to produce the proof supporting same, both for jury assessment and for later appellate review.
Having considered all of the circumstances and the intendment and theory of *642 damages, it is our conclusion that the justice of this cause requires a reversal and a new trial on the issues of damages only. Reversed and remanded for proceedings consistent herewith.
Reversed and remanded.
OWEN, C.J., and DOWNEY, J., concur.

UPON APPELLEE'S PETITION FOR REHEARING
WALDEN, Judge.
We speak to two points raised in appellee's petition for rehearing, the others being not such as to merit discussion.
In our somewhat lengthy opinion we said, with reference to appellee's ear damage:
"His permanent injury was a partial loss of hearing in one ear, which is fully correctable with the use of a hearing aid... ." (Emphasis supplied.)
Appellee now points out that our reference to only "one ear" was erroneous as there was damage to both ears. Being now so advised, we hasten to amend our original opinion to reflect correctly that both ears were involved as follows:
"His permanent injury was a partial loss of hearing in both ears, the damage in the left ear being correctable by the use of a hearing aid... ." (Emphasis supplied.)
Without acerbity, and with full appreciation of the difficulties that face counsel when briefing and making appellate presentations in a complicated appeal such as this, we would simply note in passing from a new line by line examination of the briefs of the litigants and from the closing argument of appellee's counsel the following:
A. None of the briefs contain any reference whatever to the fact that both ears were damaged. Where mentioned, and particularly in appellee's brief, reference is made to a hearing loss in an ear, same being stated in the singular.[1]
B. In the closing argument of appellee's counsel there is discussion of hearing loss, the use of a hearing aid, but there is not the first mention or reference to the fact that both ears were damaged.[2]

*643 C. Furthermore, it is our recall that during the course of oral argument a question from the Bench as to the specifications of appellee's damage did not bring forth a definitive or illuminating response as to the number of ears involved and the damage to them.
And now appellee brings these eighteen lines to our attention:
"A. My examination of the ears, nose and throat essentially showed only that he had a nerve hearing loss in both ears, worse in the higher frequencies, enough to certainly justify his complaint of decreased hearing."
* * * * * *
"A. Yes, this is permanent nonreversible hearing loss, in my past experience."
* * * * * *
"A. According to this latest test down in Miami, it seems to show that the right ear was somewhat worse than the left ear."
* * * * * *
"A. Normally we get the hearing aid for the better hearing ear. If there is a significant difference, sometimes factors of comfort, if there is not too much difference in it, it makes no difference."
* * * * * *
"Q. (By Mr. FitzGerald) In light of that is, Mr. Lassitter wearing this in his proper ear?
"A. Is he wearing it in the left ear now?
"Q. Yes, he is.
"A. Yes, I would say yes."
The above lines were scattered in amongst over two thousand pages of trial testimony; and from them it may be gleaned that indeed there was an involvement of both ears. Appellee now takes the court to task for misstating the fact, saying that the evidence on this point is clear and uncontradicted. Res ipsa loquitur.
Regardless, and in full allegiance to our judicial duty and appellate function, we have reconsidered our treatment of this appeal in light of the fact that the appellee suffered a partial loss of hearing in both ears instead of one ear. It is our judgment that our decision is responsive to the evidence and we are of the same opinion  still convinced  that the compensatory damages were excessive and without legal or factual support whether there was an involvement of one or both ears. Our conclusion was in nowise patterned upon this distinction, but rather upon the overall hearing loss and impairment.
For a second proposition the appellee takes exception to certain passages of our opinion concerning punitive damages as follows:
"... it is necessary in support of the verdict awarding punitive damages for there to be adequate proofs of the defendants' net worth."
"... the burden of proving the net worth of the defendant in such cases is on the plaintiff who has plead the claim."

*644 "... There was simply no basis therefore for the jury to perform its duty and make an informed decision as to whether the awards were too much, too little, or just right in line with Florida Standard Jury Instruction No. 6.12. Forasmuch as we or the jury could know the awards may have served to utterly bankrupt the defendants; ..."
We respond, hopefully in clarification, to the suggestion that our opinion as set forth does violence to Florida Standard Jury Instruction 6.12:
"PUNITIVE DAMAGES
"If you find for claimant and find also that the defendants ... acted with malice, moral turpitude, wantonness, wilfulness or reckless indifference to the rights of others, you may, in your discretion, assess punitive damages against such defendants as punishment and as a deterrent to others. If you find that punitive damages should be assessed against any defendant, you may consider the financial resources of such defendant in fixing the amount of such damages... ." (Emphasis added.)
At the outset, we wish to be understood as paying allegiance to the Instruction as written and in particular to the use of the term "financial resources." We agree that this is a correct exposition of the law and our opinion undertakes only to afford definition and criteria within its guideline.
Black's Law Dictionary, Revised Fourth Edition, affords these definitions:
"RESOURCES. Money or any property that can be converted into supplies; means of raising money or supplies; capabilities of raising wealth or to supply necessary wants; available means or capability of any kind."
"NET WORTH. Remainder after deduction of liabilities from assets."
It is our view that the term "financial resources" as contained in the subject jury instruction is equivalent to the term "resources" just above defined. Thus, it is reflected that financial resources is a general term which includes, but is not limited to, net worth. It encompasses many capabilities and potentials other than naked assets and liabilities. We know as a matter of everyday experience that net worth is an accounting term capable of specific definition. It affords a theoretical reflection of any defendant's ability to respond to a judgment. It was our purpose, albeit not a wholly novel one, see Tallahassee Democrat Inc., v. Pogue, 280 So.2d 512 (1st D.C.A. Fla. 1973), contra. Aaron v. Rinaldi, 296 So.2d 632 (3d D.C.A.Fla. 1974), to hold that the establishment of a net worth figure is a minimum requirement under the term "financial resources" to support an award of punitive damages. It gives the jury a prima facie basis upon which to measure the punishment factor of a prospective amount of punitive damages per Instruction 6.12, supra. Moreover, it furnishes the trial court with a defined basis whereby it may assess the sufficiencies of the proofs as concerns punitive damages. This becomes imperative when assaying the merits of motions for directed verdict and a new trial. More importantly, at least from our point of view, it furnishes a basis whereby the appellate function may be exercised. We say again, then, that an applicant for punitive damages must, as a minimum prima facie predicate, establish the defendant's net worth.
And now back to the term "financial resources" contained in the instruction. As stated, it is the broader concept and, depending upon the circumstances, there may well be additional proofs which would be helpful to the jury and court, which proofs would not be necessarily included in a defendant's balance sheet. Thus, the term gives the trial judge a more liberal standard to determine whether a given proffer of evidence is relevant and material. For instance, *645 there could well be, and properly so, proof as to income, cash flow, expenses, anticipated income, anticipated diminutions of income, anticipated casualties and, as in the instant case, proofs as to assessments of the membership possibilities. These items, among other of like moment, would be receivable in addition to net worth figures under the scope of financial resources. All of this material, including the reflection of net worth, goes to make up a defendant's financial resources which the jury is entitled to consider in assessing punitive damages exactly as commanded in Florida Standard Jury Instruction 6.12.
We confess that our effort here is intended to set a standard which can be equally employed to a private individual or corporation as well as a labor union. However, we recognize that in the case of a labor union the matter is somewhat anomalous and awkward because of its unique organization and its capability of collecting dues and assessments from its membership; however, we do not believe that this distinction is enough to create an exception.
Thus, a claimant is obliged under our system of jurisprudence to plead his case with notice and to prove his case and each essential thereof by a sufficient quantum of the evidence. Repetitively, in the case of punitive damages a claimant, as minimum, must prove the defendant's net worth. And in addition thereto, all such other evidence as he may wish as will reflect the defendant's financial resources may be received in evidence and considered by the jury. If this is not done, and if this is not to be the rule, there can be no professional basis whereby an award of punitive damages can be made the subject of appellate review.
Having now undertaken to correct and clarify our original opinion, the appellee's petition for rehearing is hereby denied.
Denied.
OWEN, C.J., and DOWNEY, J., concur.
NOTES
[1] The events supported by the record as presented by Lassitter are as follows:

"On the morning of April 8, 1970, EARL LASSITTER'S pile-driving crew for Industrial moved onto the construction site of Plaza South to commence a pile-driving sub-contract. Defendant WALTON was waiting for them.
"Although he had never met the plaintiff at all before that date, nor had any dealings with him, WALTON approached LASSITTER and ordered him off the job. Telling plaintiff, `We don't want any trouble,' WALTON called him a `son-of-a-bitch', and told him to get off and keep off or he would `beat his ass.'
"LASSITTER later left the job site and did not see WALTON until April 10, two days following. On the morning of the 10th, before LASSITTER'S arrival, WALTON was present at the site looking for him, and threatening that he better not come on the job.
"Later in the morning, plaintiff arrived at the site to oversee his crew's activities. WALTON was not at the scene when he arrived. At approximately 11:00 a.m. WALTON emerged from his car parked across the street from where Industrial's men were working.
"Pulling on a pair of tight leather gloves as he approached, WALTON came straight up to the plaintiff, told him `get your ass off my job,' and knocked him severely to the ground. WALTON then straddled the plaintiff and began to pummel him with both fists until an off-duty policeman stopped him. He was `beating the hell out of' the plaintiff until the police officer pulled him off.
"LASSITTER never struck a blow nor offered the slightest provocation. The beating he received was described by witnesses as `flailing the tar out of him,' leaving his head `all cut-up, beat-up, bruises, knots, cuts.' It also left him with a permanent hearing loss.
"After the beating, on the same day, WALTON bragged about what he had done, stating LASSITTER `didn't believe what I told him whenever I told him to stay off the job, and he came back on the job, so I took care of him.'" Brief for Appellee at 8 (1973).
[2] It may be inferred from the testimony that the agreement was with the Local.
[3] Article XXIII, Subdivision 11, Relations with Employers, reads:

"No action shall be taken by any Local Union, Local Executive Board, Officer, Committee or Business Representative, of a Local Union affecting the relations between an employer and the Local Union or its members unless authorized as hereinafter provided. * * * *
If no settlement of the dispute has been effected then the authority investigating the facts connected with said dispute may, if vested with the power so to do, immediately order and direct any necessary action deemed as required under the circumstances, through the removal of the member or members affected, through strike or by stoppage of all work, or by securing a strike of all such other trades and workmen as can be obtained." (Emphasis added.)
[4] An appendix to the brief of the local union contains fourteen newspaper articles of moderate length which were published at various times during the trial. The articles discuss events leading to the trial and the trial progress. Some of the article headlines were: "Union Harassment Claimed in Trial," and "More Testimony Given On Union Violence."
[5] The trial itself brought heated exchanges. The trial court judge admonished one attorney for calling a witness a liar, was provoked to the point of threatening to jail a union attorney and the jury heard evidence during the trial of union harassment of a union member who testified for Lassitter.
[6] Florida Standard Jury Instruction 6.12:

"PUNITIVE DAMAGES
"If you find for claimant and find also that the defendants ... acted with malice, moral turpitude, wantonness, wilfulness or reckless indifference to the rights of others, you may, in your discretion, assess punitive damages against such defendants as punishment and as a deterrent to others. If you find that punitive damages should be assessed against any defendant, you may consider the financial resources of such defendant in fixing the amount of such damages... ."
[7] F.R.C.P. 1.280 (1974) et seq., 30 F.S.A.
[1] The pertinent references to ears as contained in appellee's brief are found as follows:

At pg. 26: "During the course of Dr. Burgess' treatment of the plaintiff, the plaintiff complained of a developing hearing loss in the left ear. Dr. Burgess recommended that he obtain consultation from an ear specialist which he did."
* * * * *
At pg. 27: "When Dr. Dasher examined the plaintiff after the beating, he received a history of progressive hearing loss, and in September the doctor performed a surgical exploration of the plaintiff's inner ear, as a result of which the doctor concluded, and testified, that the plaintiff's hearing loss was caused by nerve damage. The doctor further testified that in his opinion this nerve damage hearing loss was the result of and caused by the traumas to the head received by the plaintiff on April 10 from the beating. The doctor further testified that in his opinion the hearing loss was permanent and non-reversible and would require the plaintiff to wear a hearing aid in his ear the rest of his life."
* * * * *
At pg. 61: "[T]he uncontradicted evidence shows ... trauma-caused permanent and irreversible nerve damage to plaintiff's ear, resulting in functional deafness without the constant and `forever' use of a hearing aid."
[2] The pertinent references to ears as contained in appellee's closing argument are found in the record as follows:

At pg. 1946: "And we know that he had a hearing loss from this beating."
* * * * *
At pg. 1953: "[T]he cost of the one hearing aid he has now is 330 some dollars... .
"... Dr. Burgess told you that somewhere along the course of his treatment Earl Lassitter began to complain of pain and difficulty in hearing and that he, Dr. Burgess, referred him or recommended that he go to an ear specialist."
* * * * *
At pg. 1955: "Now Dr. Dasher testified as to his findings, conclusions and treatment. And he said Earl Lassitter has nerve damage to the inner ear ... [I]n his opinion based upon reasonable medical certainty the beating and blows that Earl Lassitter suffered was the cause of the hearing loss he has now, which is permanent and irreversible, and for which he now needs and does indeed wear a hearing aid."
* * * * *
At pg. 1958: "... 28 more years of going with the diminished hearing ...
* * * * *
"... [T]his hearing loss is permanent, irreversible, and caused by the beating."